## STATE v. RADON
(No. 1785; Feb. 14, 1933; 19 Pac. (2d) 177)

For the defendant and appellant there was a brief by *Lin I. Noble* and *C. R. Ingle*, both of Thermopolis, Wyoming, and an oral argument by *Mr. Noble.*

For the plaintiff and respondent there was a brief by *J. A. Greenwood,* Attorney General; *R. J. Jackson,* Deputy Attorney General; *George W. Ferguson,* Assistant Attorney General, and *R. Dwight Wallace,* Assistant Attorney General, all of Cheyenne, Wyoming, and oral arguments by *Mr. Jackson* and *Mr. Wallace.*

BLUME, Justice.

The defendant Dan Radon was tried for killing one Marco Ragonovich and was convicted of murder in the first degree, without recommendation, and was sentenced to be hung. He thereupon appealed the case to this court.

Much of the testimony vital in this case was given by foreigners, mostly Serbians, not able to speak English well, and hence it is somewhat difficult to measure the exact effect of the testimony. The following is a brief summary of the facts or testimony as developed on the trial. Both deceased and defendant were Serbians. The homicide took place on the morning of September 25th, 1931, at Gebo in this state. Early that morning the defendant had gone to the hills, for the purpose, as he claims, to shoot rabbits, and carried the gun with which the deceased was killed. About 9:30 he went to the pool hall, in which a number of men were then gathered. He watched a game of cards, and Mike Jukovitch suggested that he, the deceased and the defendant play a game of rummy. The latter answered that he did not want to play, because the deceased would "cry too much" in the game, which we take to mean that he would complain if he lost any money. Witnesses both for the state as well as for the defendant testified that the deceased thereupon became angry, twice got up to fight with the defendant, and that he abused and reviled the latter. He spoke in the Serbian language, not understood by the Americans present. According to a number of witnesses who spoke Serbian, including a witness for the state, the language used was extremely vile. We hesitate to set it out, and it is not necessary. So disgusted was the presiding judge that he remarked that he would not permit the interpreter to go "into the vilest stuff that can be used in the slums of America or Europe." He allowed the witnesses for the defense, however, to testify in full concerning it. Suffice it to say, that, without stating what effect it had upon

the mind of the defendant, it was apt to arouse the ire and passion of the ordinary man, and some of it implied threats of violence upon the person of the defendant, the extent of which it is hard to state. Soon thereafter the deceased left the pool hall, and perhaps ten minutes after that time the defendant did likewise. Up to that time the latter showed neither by words nor by gestures any intention of his subsequent act, but stood by substantially silent without any indication of resentment. He went to one of the offices and inquired whether or not he could go back to work in the mines and was told that there was no place for him at that time. About 11 o'clock he returned to the pool hall, noticed that the deceased also was coming toward that place and halted at the front steps. The latter had a small package in his right hand. Defendant testified that while he did not know what the deceased had in his hand, his attitude was menacing; that it made him afraid, and he feared that the deceased would kill him; that he told him to stop, and when the deceased failed to do so, he, the defendant, fired a shot, but that deceased continued coming toward him and that he, defendant, fired two more shots; that he was excited, and confused, went to or toward his rooming house, in the neighborhood of which he was soon thereafter placed under arrest. Other witnesses testified that five different shots were fired.

No special motive for the murder appears in the evidence, and if not committed in self defense would appear to have been committed either out of revenge for the insults heaped upon defendant by the deceased, or because the defendant let his ire and his passions get the better of him, goaded on, as he perhaps was, by the conduct of the deceased on the morning of the homicide and by similar conduct on previous occasions, in connection with which much uncontradicted testimony was given by witnesses called on behalf of the defendant. The latter and

the deceased had both lived in Butte. In fact defendant had come from that place only a few weeks previous to the homicide in question, going to Gebo in the hope of finding work there in the coal mines. While both were at Butte, the deceased, according to the testimony, had a number of times assaulted the defendant, once having a gun in his hands, the assaults generally accompanied by insulting remarks—once at least by a threat that he would send the defendant to the graveyard. The defendant testified that he was afraid of deceased, and that the latter was in the habit of carrying a gun or a pair of knuckles. After the homicide in question, no gun or knuckles, however, were found on the deceased. The defendant sought to show by the county attorney that at the time when the room of deceased was searched, immediately after the homicide in question, these deadly weapons were found. But that was denied. We might say in that connection, that there is in the record an affidavit on the part of Mary Yanich, with whom both the defendant and the deceased roomed, that the county attorney and the sheriff came to her home to search the room of the deceased, and that they found a large knife, a pistol and some shells. The sheriff, by affidavit, denied this, but claimed that Mrs. Yanich handed him a pistol, which was found in another part of the house, telling him that it was the gun of the deceased. The gun with which the homicide in question was committed was found near the defendant when placed under arrest. Other facts will be stated hereafter. A number of errors are assigned. Most of them we deem to be without merit or not prejudicial. Only a few need be noticed.

1. Before the trial of the case, the appellant filed a motion to direct the jury commissioners of Hot Springs County to certify to the clerk of court the names of all taxpayers on the tax list, and whose names should appear upon the combined assessment roll and tax list of that

county for the year 1931, and that the jury panel of 42 selected from the list already made be set aside. This motion was denied and this action of the court is assigned as error. It is the contention that John W. Sapp, who at the time of making the list acted as chairman of the board of county commissioners of Hot Springs County, was not authorized to assist in making the list. One Virgin was chairman at that time, but was absent from the county. Section 61-206, Wyo. Rev. St. 1931, provides that the chairman of the county commissioners, the county treasurer and the county clerk shall make the jury list for the ensuing year. Section 30-607 provides that the county commissioners shall choose one of their number as chairman who shall preside at all meetings when present and in case of his absence one of the other members may act as temporary chairman. In view of the fact that Virgin, the chairman, was absent from the county at the time, we think that John W. Sapp was authorized in assisting to make the list. It has been held, under a statute under which a deputy may act in place of his principal, that such deputy may assist in making up the jury list. State v. Turner, 114 Ia. 426, 87 N. W. 287; Stevens v. State, 53 N. J. L. 245, 21 Atl. 1038; State v. Reeves, 129 La. 714, 56 So. 648; Sturgis v. Sugar Co., 184 Mich. 456, 151 N. W. 746. The situation in the case at bar is analogous. The case of State v. Payne, 6 Wash. 563, 34 Pac. 38, is cited as holding the contrary. But the holding in that case was arrived at on account of the peculiar wording of the statutes of Washington, and we do not consider it in point.

2. It is claimed that the jury list was not complete, and therefore void, leaving out, as it did, the names of 579 men. It was stipulated that the combined assessment roll and tax list of Hot Springs County for the year 1931 did not contain the names of these men, since they only paid a poll tax, or only the so-called "registration fee" on an

automobile or truck, and that these names were not omitted because of incompetency or disqualification to serve as jurors, but because their names did not appear on the assessment roll. Section 61-201, R. S. 1931, provides that a person competent to act as juror must be assessed on the last assessment roll of the county. Section 115-137 provides that whenever the name "assessment roll" is mentioned in the laws of this state it shall be understood to mean the combined assessment roll and tax list. Section 61-207 provides that the jury commissioners must select from the last assessment roll of the county and make a list of the names of all persons whom they believe to be competent and qualified to serve as trial jurors. A substantial compliance with the requirements of the statute is necessary, and the jury list must be made from the names on the assessment roll and must consist of substantially all whom the jury commissioners believe to be qualified. Meldrum v. State, 23 Wyo. 12, 34, 146 Pac. 596. In State v. Bolln, 10 Wyo. 439, 70 Pac. 1, it was held that while a substantial compliance with the statute is sufficient, an intentional disregard of the statute by reason of an erroneous interpretation of its provisions or otherwise cannot be deemed a substantial compliance with it. The 579 names above mentioned were not, as already stated, on the combined assessment roll and tax list, and the mistake, if mistake it was, of not entering the names thereon was, accordingly, made by the county assessor and not by the jury commissioners, and there may be some question as to whether or not, accordingly, there was an intentional disregard or an erroneous interpretation of the statutory provisions on the part of the jury commissioners, as stated in State v. Bolln, supra. Be that, however, as it may, we do not believe that any mistake was made in this case. Section 115-123, R. S. 1931, provides that the assessor shall list upon the assessment rolls the name of the individual to whom any property shall

be taxable, and certain real and personal property, including all property not enumerated. A poll tax is required to be levied upon all persons between the ages of 21 years and fifty years inclusive. Section 115-2309. And the assessor must demand payment of the poll tax of every person liable therefor whose name does not appear upon the assessment list. If a person has real or personal property, the poll tax must be entered upon the assessment roll. Sec. 115-2312. And under Section 115-2316, the assessor shall keep a separate roll of the names of all persons subject to or liable for a poll tax. It would seem, accordingly, that the names of the persons who are liable to pay a poll tax only, but who have no assessable property in the county are not entered upon the assessment roll, so that the omission of these names, accordingly, from that roll would be no error and these persons would not be qualified to act as jurors under the provisions of our statute.

In 1929, now appearing as Sections 72-103 and 72-107, Wyo. Rev. Stat. 1931, a special provision was made for the assessment for the purpose of taxation of all motor vehicles and trucks in use, in accordance with which all automobiles and trucks are taxed in accordance with a certain scale. Section 72-103, supra, provides that these taxes or licenses shall be in lieu of all other taxes except those that may be imposed by a municipality; Section 72-107 provides that every owner of an automobile or truck must file an application in the office of the county treasurer of the county where the owner of the vehicle or truck resides, and that the names of the applicants, together with a description of the motor vehicle, shall be kept on a separate record known as the "automobile register." It would seem, accordingly, that Section 115-123, supra, was thereby modified, so that the names of persons paying a tax, or license, only on a truck or automobile, need no longer be entered on the ordinary assessment

roll. The court, therefore, did not commit error in over-ruling the motion of the appellant heretofore mentioned.

3. John Radulovich was a witness on behalf of the state, and testified to seeing the defendant after the homicide; that the latter stated among other things that he was glad he had killed the deceased; that he, the witness, wanted to take the defendant to the sheriff's office, but that defendant answered in effect that he would "get" both the witness as well as the sheriff. On cross-examination he was asked: "You are one of the men who threatened some of the boys out there at the mine because they were trying to get up some money to defend Dan, are you not?" The question was objected to as incompetent, immaterial and irrelevant and not proper cross-examination. The objection was sustained by the court, and the defendant thereupon offered to show by the witness the fact implied in the question put to him, and the offer was refused. The ruling of the court was clearly erroneous, since the offered testimony would have shown bias on the part of the witness. His testimony in chief was important, and the ruling, accordingly, was prejudicial. One of the purposes of cross-examination is that facts may be brought out tending to discredit the witness by showing that his testimony in chief was biased, and the denial of a fair latitude in cross-examination is a denial of a substantial right and a withdrawal of one of the safe-guards essential to a fair trial. Alford v. United States, 282 U. S. 687, 51 Sup. Ct. 218, 75 L. Ed. 624. Substantially the same thing was held by us in State v. Wilson, 32 Wyo. 37, 228 Pac. 803, where we stated that interest and bias might always be shown on cross-examination. See also The Pullman Co. v. Finley, 20 Wyo. 456, 125 Pac. 380.

4. The defendant asked the court to give the following instruction:

"You are instructed that in this case the evidence is undisputed that prior to the shooting of Marco Ragonovich by the defendant, the said Marco Ragonovich had made threats to kill the defendant, and it is also the undisputed evidence that Marco Ragonovich, a short time prior to the shooting, had attempted to assault the defendant, and these facts, together with all the other evidence in the case, must be considered by you in arriving at your verdict."

The instruction was refused, and error is predicated thereon. The State claims that there was no error in the action of the court because the instruction assumed that threats and the attempted assault had been proved, and it is said in 16 C. J. 951:

"The mere fact, however, that there is no conflict in the evidence with regard to certain facts does not authorize the court to assume that they are proved, as there may be a question as to the weight and credit to be given to the evidence. An instruction which informs the jury that the evidence proves certain material facts is properly refused even though there is uncontradicted evidence of such facts for the jury, although such instruction, if given, may not be sufficient to cause a reversal."

The cases cited bear out the text, though the rule is not without its qualification, and at times undisputed facts may be assumed. State v. Anderson, 154 Iowa 701, 135 N. W. 405; Denmark v. State, 49 Ga. App. 157, 161 S. E. 286. As a rule, an instruction on the subject of threats and previous difficulties should be given, when the evidence fairly presents the question, particularly when a correct instruction is asked. Wharton on Homicide, Sec. 246; 30 C. J. 387; Durham v. State, 29 Wyo. 85, 210 Pac. 934. In Price v. State, 1 Okl. Crim. Rep. 358, 98 Pac. 447, it was held that though the requested instruction was not to be approved, it sufficiently called the attention of the court to the subject, so as to require a correct instruction on the subject. We need not decide whether that should

be the rule. In the case at bar, the court, by instruction No. 41, instructed the jury that they might take previous difficulties and threats into consideration, and in view of this fact, we do not think that, under the circumstances, we can hold that prejudice to the defendant resulted by not giving the instruction asked.

5. In instruction No. 8, which is substantially duplicated in instruction No. 14, the court said:

"The jury is instructed that in order to excuse the defendant on the ground of self-defense, there must be some act or declaration at the time of the killing of the person on the part of the deceased to kill him or to do him great bodily harm. To constitute self-defense the belief or apprehension of danger entertained by the defendant must be founded on sufficient circumstances to authorize the opinion, in a reasonable mind, that the deadly purpose entertained by the deceased then existed, and the fear that it will at the time be executed."

Two different matters are presented in this instruction. The last part of the instruction does not appear particularly objectionable, except, perhaps, that the word "sufficient" should be avoided. The first part of the instruction refers to declarations of the deceased at the time of the shooting. The defendant did not claim that the deceased made any such declarations at the time of the homicide and reference thereto was not in accordance with the evidence. The rule which the court, perhaps, had in mind in giving the instruction is that stated in 30 C. J. 64 as follows:

"But it is necessary that he (the deceased) shall have indicated by some overt act or hostile demonstration at the time of the killing a real or apparent intention to kill or inflict great bodily harm upon accused and thereby induced the latter to believe on reasonable grounds that he was in imminent danger and that it was necessary to kill and save himself."

Some act, of course, had to take place to give the appearance of danger, and to give the defendant reasonable ground therefor. But an actual assault or attack on the defendant was not necessary, if the circumstances gave reasonable ground for apprehension of imminent danger. 30 C. J. 64. In the case at bar the deceased walked toward the defendant. He had a package in his hands, wrapped in paper. That, apparently, turned out to be a pair of gloves. Still, while there is no specific evidence of the size of the gloves, how the deceased held the package, and whether it gave the appearance that it contained a gun or other dangerous weapon, the defendant says that the attitude of deceased put him in fear, evidently intending to convey the idea, in his broken accent, that he thought that the deceased was carrying a deadly weapon, and we are not prepared to hold that, as a matter of law, in view of previous difficulties and threats, he might not have had reasonable ground to believe that he was in imminent danger, even though the deceased was not guilty of any actual assault. But the instruction given by the court—leaving out of consideration the reference to a ''declaration,'' seems to require such actual assault, for to say that the deceased must have done some act *to kill the defendant* can mean nothing else than that he was then engaged in an attack which, if carried out, would have resulted in death or great bodily harm. The second sentence of the instruction does not modify the first, but treats of circumstances creating an apprehension of danger as a separate matter. This is also true of instruction No. 16, in which the court said:

''The danger which will justify the killing of a human being must be actual, present and urgent, and appear to a reasonable mind to be actual, present and urgent.''

Here the jury were told, without the possibility of misinterpretation, that there must be not only apparent

danger, but also actual danger, in order to justify the killing on the ground of self-defense. There was no actual danger in the case at bar. The deceased had no gun or other dangerous weapon with him. Hence the question of self-defense was substantially taken away from the jury by these instructions. That we think, was prejudicial error. The theory in the case at bar was that there was an apparent danger, not actual danger. Where the evidence presents that theory, as in the case at bar, an instruction which limits the right of self-defense to actual or real danger alone is erroneous. 30 C. J. 377. It is true that in other instructions the jury were told that if the danger was apparent, though not actual, this would be sufficient, and the state, accordingly, claims that instructions 8, 14 and 16 were harmless. But the trouble is that there is no way to tell which instructions the jury followed. It is said in 38 Cyc. 1604:

"Conflicting or contradictory instructions furnish no correct guide to the jury, and the giving thereof is erroneous. * * * Instructions of this character are misleading, as the jury are not supposed to know when the judge states the law correctly and when incorrectly, and they should not be left to reconcile conflicting principles of law. The giving of contradictory instructions is ordinarily held ground for reversal. The error in giving incorrect instructions is not cured by giving correct instructions in conflict with them. The error can only be cured by an explicit withdrawal of the erroneous instructions. Where instructions are inconsistent with or contradict each other, it is usually impossible to say whether the jury was controlled by the one or the other."

6. By instruction No. 15, the court told the jury that to justify self-defense, "the defendant must be without fault in bringing on the difficulty." Instruction No. 24 is as follows:

"You are further instructed that if you believe from the evidence that the defendant provoked the difficulty or began the quarrel with the purpose of taking advantage of the deceased, and of taking his life, or doing him some great bodily harm, then there is no self-defense in the case, however imminent the peril of the defendant may have become during the difficulty in consequence of an attack made upon him by the deceased; and if under such circumstances the jury believe that the defendant shot and killed the deceased, then the defendant is guilty of murder in the first degree, and the jury should so find."

Again, by instruction No. 15, the court referred to the defendant voluntarily entering into difficulty with the deceased, and in instruction No. 26, to the defendant being the aggressor. We cannot see, howsoever correct the instructions may be theoretically, that they, or the parts mentioned, had any application herein under the evidence. It would seem to be clear that reference was intended to be made to the defendant's remarks in the pool hall, that he did not want to play with the deceased because the latter would "cry too much." If that is true, and we think it is, then, since there was no dispute that the defendant made this remark, the court substantially took away from the defendant the right of self-defense. But the remark mentioned was not, we think, reasonably calculated to lead to an affray; there is no indication that it was intended to do so or that it was the natural consequence thereof. The evidence does not indicate that the remark was made for the purpose of taking advantage of the deceased, or to take his life, or to do him some great bodily injury. We said in State v. Flory, 40 Wyo. 184, 276 Pac. 458;

"Not every provocation, of course, will deprive a man of his right of self-defense. It must be one reasonably calculated to lead to an affray, was intended to do so and is the natural consequence of his acts. 13 R. C. L. 833; 30 C. J. 53; Polk v. State, 30 Tex. App. 657, 18 S. W. 466; State v. Castello, 62 Iowa 404, 17 N. W. 605."

And in Wharton, Homicide, Sec. 318, it is said:

"Upon the question what constitutes freedom from fault, however, the rule has been laid down that a person may have a perfect right of self-defense, though he may not be wholly free from blame, the question turning upon the nature of the blame or wrong; and that if the wrong was not intended to produce the occasion, and was not an act which, under the circumstances, was reasonably calculated to produce the occasion or provoke the difficulty, then the right of self-defense would be complete, though the act was not blameless; but if the act was in violation of law, and was reasonably calculated to produce the occasion, the right of self-defense would be abridged."

Even if, however, the remark of the defendant could be construed as reasonably calculated to bring on an affray, there was plenty of cooling time for the deceased, and it could not be said to have warranted the deceased of making an apparent display, if such display was made, which would cause the defendant to be put in imminent fear of life or great bodily harm. We think that instruction No. 24, and those parts of the other instructions above mentioned, were highly prejudicial.

7. Error is assigned because the court admitted a pair of gloves in evidence. It is claimed that these gloves were not sufficiently identified. It will be recalled that the defendant testified that the deceased had a small package in his hands, which put him in fear of his life, evidently attempting, as already stated, to give the impression that he believed that what the deceased had in his hand was a deadly weapon. The witness Rae testified that he saw the deceased carry a small package. The witness Easton testified that he picked up at the place where deceased was killed a package with gloves. The coroner of the county had a pair of gloves in his possession, which were introduced in evidence. He testified that "they were given to me out at Gebo and I brought them into town. Q. Given

to you at the time you took possession of the body? A. Yes, sir.'' The identification of the gloves as those which were picked up by the witness Easton was, perhaps, not complete, inasmuch as the latter failed to testify that he gave the package to the coroner, nor did the coroner testify that he received it from Easton. As to what kind of package it was that was carried by the deceased which the defendant testified put him in fear is, of course, of importance on the question of whether or not there was reasonable ground for apprehension of imminent danger, and hence care should be taken, in another trial, that the identification be as complete as possible.

8. Error is assigned that the interpreter was not sworn, as such, and that seems to be true. But we need not pass on the effect thereof, since the error will probably not occur again. Error is also assigned on account of the separation of the jury after they were duly sworn in the case. We held in Nicholson v. State, 18 Wyo. 298, 106 Pac. 929, that where the jury in a capital case is permitted to separate so as to give opportunity of communicating with the members thereof, a presumption of prejudice arises therefrom, which, if not overcome by a satisfactory showing to the contrary, entitles the defendant to a new trial. There is no doubt in this case that the jury were permitted to separate, and that opportunity to communicate with them was given. The state claims that the presumption of prejudice was fully overcome. We need not pass upon that point, since the error will probably not arise again, except to say that the trial court should rigidly enforce the statutory requirement and greater care should, in another trial, be taken in guarding the jury. Error is further assigned that some of the members of the jury indulged in the use of intoxicating liquor during the trial. It is not necessary to pass upon that point, or to determine whether the record shows the allegation to be true. The jury should, of course, refrain from the

use of such intoxicating liquor (16 C. J. 1080), and we have no doubt that, if they are properly guarded, no ground for complaint in that regard will hereafter be given.

For the errors heretofore indicated, the judgment of the trial court will be reversed, and the cause remanded for a new trial.

*Reversed and Remanded.*

KIMBALL, Ch. J., and RINER, J., concur.