Lorin CAVANESS, Appellant
(Defendant below),

v.

STATE of Wyoming, Appellee
(Plaintiff below).

No. 2913.

Supreme Court of Wyoming.

Jan. 10, 1961.

Paul Allen Barber and Thomas J. Fagan, Casper, for appellant.

Norman B. Gray, Atty. Gen., and W. M. Haight, Deputy Atty. Gen., for appellee.

Before BLUME, C. J., and PARKER and HARNSBERGER, JJ.

Mr. Justice PARKER delivered the opinion of the court.

The State charged in the District Court of Natrona County that Lorin Cavaness willfully, unlawfully, feloniously, purposely, maliciously, and with premeditation murdered Frank Berrigan on August 2, 1958. Defendant was tried by a jury, found guilty of second-degree murder, and sentenced to a term of not less than twenty nor more than twenty-one years in the penitentiary.

He has now appealed, charging as errors of the trial court that the evidence did not warrant a finding that the killing was done maliciously; Instruction 10 was improperly given; Instructions A, B, C, and D, submitted by the defendant, were improperly refused; the court denied defendant's motion for a directed verdict and his motion to reduce the charge from murder in the first degree to manslaughter; and the court denied his motion for new trial wherein it was contended among other things that the attorneys for the State quoted and read from the opinion of a supreme court case, the language of which was inflammatory and calculated to prejudice the jury.

Defendant did not deny the homicide and there are only two basic questions raised. First, was defendant justified in taking Berrigan's life; and second, if he was not, did he at the time of the killing act purposely and maliciously?

There was evidence of previous altercations between the deceased and his wife, Mary Berrigan, and between defendant and the deceased. According to the defendant, he did not visit the Berrigan home when the deceased was there. On the morning of August 2, at the invitation of his wife, he had joined her at the home of his stepdaughter, Mary Berrigan, between ten and eleven-thirty. He testified:

"I walked in, sat the bottle [a pint of liquor] on the table in the kitchen. I broke the seal and my wife poured the drinks. Well, she poured a pretty good shot for Mary, but she poured a bigger one for me because if I take a drink I like to have a good one. My wife is a very, very poor drinker. She doesn't take a heavy drink, so we had that one drink, and I suggested to my wife that we go to the fair, and from the fair stay all night at the Henning Hotel. Well, she decided she would, so she went into the bedroom, took off her housedress and was getting ready to dress. While she was in there, why, Mary and I—I know we had two more, so that would make at least three there, and while we was on the last one—it could have been four. While we was on the last one Frank came in. He never spoke to me. He never let on like I was there, but he walked around the table, and Mary—she was sitting at the end—she jumped up and Frank was mad, and he says, 'Damn you, drinking again,' and he kept on going towards her, and she was right in front of the door between the living room and the kitchen, and he swung at her, and hit her and knocked her back into the living room. By that time Mom, my wife, came to the door, and I said, 'Mom, come on, let's get out of here,' and she said, 'I don't want to leave Mary.' So I knew then that if I stayed there that I was in for it. As soon as Frank got through with her I would be next, and after he got through with me then, without a doubt, it would have been my wife, and I had this gun in my glove compartment which I had bought at a sale. I proceeded to the car and got the gun, took the box of shells and put in, oh, I would say five or six—probably it was six shells—went back to the house and walked in, but I didn't put a bullet in the chamber, showed Frank the gun, and I told him right then, 'Frank, I want you to quit beating up on Mary; I have seen it so many times, and I don't want to see it anymore.' He seen the gun, and I am sure he didn't think there was any ammunition in it, so he started around, and I took and threw a bullet in the gun, and then I told him, 'Frank, this gun is loaded. Don't come any closer.' Two or three times I told him that, 'Frank, stop, don't come any closer.' I thought I could bluff him out and hold him until my wife got dressed so we could get out of there, because I didn't want to leave my wife there, as mad as he was.

"So he said, 'Shorty, you had better make it good because if you don't I'm going to get you,' and he kept on coming, and I fired at him, but it never slowed him up. He kept coming, the second time I fired at him, and the third time we were together wrestling, he was trying to get the gun away from me, but he didn't manage it. He took a swing at me while he was moving then, but I got under it, and he didn't hit me, and while we was grappling I am quite sure that is how I got shot in the wrist. I had my arm around him, and the third shot must have went through him and through my wrist. He turned around half way down toward the sink and started sliding down. All at once he just tipped over on his face. * * *"

According to the testimony of Mary Berrigan, defendant had arrived at the Berrigan residence between ten and eleven o'clock on August 2. She, her mother, and defendant had each had a drink at the kitchen table. She was not in that room

all the time but was cleaning the house and was also in the bedroom and living room. The deceased came in between eleven and twelve, entering through the back door, going to the living room where she was; he said nothing, slapped her, and knocked her glasses off. She did not know why he did this unless he had seen the liquor bottle and it had angered him. Deceased went back to the kitchen and talked to defendant. She went through the kitchen into the back bedroom where her mother was, talked to her mother who was dressing, and remained there five or ten minutes. Defendant came to the back bedroom, said "Get dressed, Mom, and I'll take you down to the Henning Hotel," and went out. She stayed there a few minutes longer, talking to her mother, and then went back into the living room and polished furniture for five or ten minutes. Following that, she went out to the refrigerator and began to get out food for lunch. She saw defendant and the deceased but could not hear what was being said as their voices were not raised. Then she heard a noise that sounded as if someone was pulling a cork out of a bottle and defendant asked her to call the cops.

■ Defendant contends that the case was submitted to the jury under improper instructions which precluded a fair consideration of the defense of justification. He first insists that under State v. Sorrentino, 31 Wyo. 129, 224 P. 420, 34 A.L.R. 1477; Id., 31 Wyo. 499, 228 P. 283, 34 A.L.R. 1487, the jury was entitled to determine whether a cautious and prudent man under the circumstances would have believed the danger to have been real. The trial court recognized this rule when in Instruction 10 it said:

"It is not necessary to this defense that the danger should have been actually real, or that the danger should have been impending and immediately about to follow. All that is necessary is that the defendant had reasonable cause to believe and did believe these facts."

It is next urged that the final paragraph of Instruction 10 is confusing and serves to withdraw the defense of justification mentioned in the earlier portion of the instruction. We do not think that this criticism is warranted. The portion of the instruction to which the objection is thus made reads as follows:

"But before you acquit on the ground of self-defense, you ought to believe that the defendant's cause of apprehension was reasonable. Whether the facts constituting such reasonable cause have been established by the evidence in this case, you are to determine, and unless the facts constituting such cause have been established by the evidence in this case, sufficient to create in your minds a reasonable doubt as to the guilt of the defendant, you cannot acquit on the ground of self-defense, even though you believe the defendant really thought he or Mary Berrigan was in danger."

Defendant argues that the exclusion of Mrs. Cavaness from the category of third persons whom defendant rightfully sought to protect materially weakened the defense of justification. According to the evidence, deceased had not addressed himself to Mrs. Cavaness; she had not been in the same room with him; and there was no basis for a reasonable man to have expected any attack upon her. We, therefore, see no merit in this complaint.

Defendant also argues that the court failed to recognize the rule enunciated in State v. Bristol, 53 Wyo. 304, 84 P.2d 757, that it is not unlawful for a defendant to arm himself in reasonable anticipation of a dangerous attack, and that the mere fact of arming himself does not justify the inference that this is done for the purpose of attacking or provoking deceased. He insists that his fault, if any, was not legally sufficient to brand him as the one who provoked the conflict in bringing a weapon on the scene, and cites State v. Radon, 45 Wyo. 383, 19 P.2d 177. He overlooks the further rule growing out of the Bristol case wherein it was said that a personal affront

of such serious character as to be reasonably calculated to provoke a dangerous assault from another is generally deemed sufficient to authorize a jury to deny the ordinary right of self-defense. See State v. Radon, supra.

In the instant case, the jury was entitled to consider all the evidence, including defendant's account of what was said to the deceased prior to the shooting. In the light of the previous trouble between the two, the evidence of his returning to the room with the gun and announcing his ultimatum to Berrigan provided substantial evidence upon which the jury might have properly determined that he had provoked the altercation so as to deny him the right of self-defense.

It frequently happens that an instruction to the jury, given in the heat and haste of a trial, is not as perfect as might be hoped, and undoubtedly that is true in the present instance. Nevertheless, the central idea of the final paragraph of Instruction 10 is that the defendant's cause of apprehension must have been reasonable in order to justify acquittal, and we do not find that defendant was prejudiced by the court's giving of the instruction.

■ At the trial, defendant objected to the court's failure to give four proffered instructions, but no argument is presented here regarding any request except for Instruction D which stated:

"The Court instructs the jury that they may consider the testimony of the witnesses on behalf of the defendant as to his peaceful disposition in determining whether or not the defendant intended to discharge the weapon which he brought upon the scene in in the absence of aggression on the part of the deceased necessitating such use in the defense of himself or third persons who were then and there present."

No reason is advanced why is was necessary that such an instruction be given when the matter was amply covered by Instruction 13 which provided that evidence regarding the character of defendant might be considered in determining who was the aggressor in the case.

■ It is maintained that the evidence does not warrant a finding that the killing was done maliciously. In State v. Sorrentino, supra, 224 P. at page 423, it was said:

"* * * In its popular sense, the term malice conveys the meaning of hatred, ill will, or hostility toward another. * * * That is not its legal meaning, but the term nevertheless implies a wicked condition of mind while the homicide is committed; a mind, we may say, committing the very act willfully. * * *"

From the statements of defendant even without corroboration of other evidence, the jury might well have found that he killed maliciously

It is also argued that there is a lack of motive—that the only one asserted by the State, i. e., Berrigan no longer deserved to live and defendant would act as his executioner, was rejected when the jury decided that defendant was not guilty of first-degree murder. We doubt if this is entirely true under the circumstances shown in the record which were susceptible of an interpretation that defendant intended to take matters in his own hands but did not formulate any plans regarding a killing. This was particularly borne out by Cavaness's statement of what he told Berrigan after he returned to the house, "Frank, I want you to quit beating up on Mary; I have seen it so many times, and I don't want to see it anymore." To the same effect was his voluntary statement to the deputy sheriff wherein he answered to a query of why he had shot the deceased that he did not know unless it was because of his shoving people around.

■■ In this court and in the motion for new trial, it was contended that the defendant was substantially prejudiced and deprived of a fair trial because of misconduct of the prosecuting attorneys who read to the jury from a Wyoming opinion.

The record does not indicate that any objection was interposed to the conduct of the attorneys at the time of the argument, and accordingly the question may not be raised at this time. The matter was discussed at length in State v. Spears, 76 Wyo. 82, 300 P.2d 551, 562, wherein we pointed out that if a party considers that the conduct of opposing counsel is improper he should at the time voice an objection so that the trial court may take steps to rectify the damage if that is possible. Any failure to do this will be considered as a waiver of the objection to such conduct.

A careful review of the record discloses no error prejudicial to the defendant, and the judgment must therefore be affirmed.

Affirmed.