**Frank James William PATTERSON, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 83–190.**

Supreme Court of Wyoming.

June 13, 1984.

Rehearing Denied July 5, 1984.

Leonard D. Munker, State Public Defender, Sylvia Lee Hackl, Appellate Counsel, Wyoming Public Defender Program, and Martin J. McClain, Asst. Appellate Counsel, Cheyenne, Wyoming Public Defender Program, for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Allen C. Johnson, Senior Asst. Atty. Gen., and Timothy Judson, County and Prosecuting Atty., Fremont County, for appellee.

Before ROONEY, C.J., and THOMAS, ROSE, BROWN and CARDINE, JJ.

ROONEY, Chief Justice.

Appellant was convicted of first-degree murder by a jury on June 4, 1983. He was sentenced to life imprisonment in the Wyoming State Penitentiary. On appeal from that judgment and sentence, appellant states the single issue raised on appeal as follows:

"Whether the trial court's refusal to instruct the jury upon the defense's theory of self-defense was prejudicial error."

We affirm.

■ An appellant is entitled to instructions which cover his theory of the case if the offered instructions are sufficient to inform the court of such theory and only if there is competent evidence in the record to support them. *Scheikofsky v. State*, Wyo., 636 P.2d 1107, 1109 (1981); *Jackson v. State*, Wyo., 624 P.2d 751, 757, cert. denied 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981); *Goodman v. State*, Wyo., 573 P.2d 400, 408 (1977).

■ An instruction should not be given if it is not reasonably supported by the evidence, or if it is not based on some theory logically derived from some part of the evidence. Therefore, an instruction should not be given based on evidence which at best raises a possibility or conjecture, or which is inconsistent with the physical facts. When viewing the evidence to determine whether an instruction should be given, we view the evidence in a light as favorable to the defendant as is justifiable, and the defendant's testimony must be taken as entirely true. *Goodman v. State*, supra, 573 P.2d at 409.

■ A review of the evidence in this case and in this fashion does not support a theory of self-defense. Appellant, with Bonnie Whaley, Charles Thorpen and Robert Willis met Jerry Riddle at a video arcade in Riverton, Wyoming. They were taken by Riddle to "party" at Griffy Hill. They then approached Riddle to drive the group to California, and he agreed to do so. They gathered their belongings into Riddle's van, and began their journey. They headed for Rock Springs, with Riddle driving. As they reached the Rawlins turn off, Willis took over driving. The road conditions were less than optimum; blowing snow hindered visibility somewhat.

At this point, Willis was in the driver's seat, appellant was in the passenger's seat, and Riddle, Thorpen and Whaley were in the back on the floor. Riddle, who was

quite drunk, began playing with a dagger, which he gave to Willis when requested. Riddle then began handling a butter knife and a potato peeler, saying that he could make a weapon out of anything. Appellant then invited Whaley to move up to the passenger seat with him, for safety sake. As she was moving, Willis asked Riddle, "if it would be all right if he incapacitated him." Riddle answered, "If you don't trust me, tie me up." Appellant proceeded to tie Riddle's hands and feet. Shortly thereafter, when Riddle complained that his circulation was being cut off, appellant loosened the bindings on his hands. When appellant returned to his seat, Riddle got loose and put a choke hold on Willis, the driver of the van. Appellant grabbed Riddle, pulled him off Willis, and then hit his head against the console of the van several times, rendering Riddle unconscious.

Willis told appellant to retie Riddle, and to try to wake him, to make sure he was not dead. Riddle never fully regained consciousness, but he did at one point say "yes, sir" several times in response to being told to wake up. Willis, in the meantime was angry at Thorpen for letting Riddle get hold of Willis, and told Thorpen, "You dumb son of a bitch, you let him try to kill me. Now you're going to kill him or I'm going to kill you." Willis also told appellant that he, Willis, owed him one, for pulling Riddle off him. Willis also at this time stabbed Riddle in the leg with a knife to see if Riddle were alive. There was no response from Riddle.

Willis soon found a place to pull off the road, and he did so, and stopped the van. Appellant carried Riddle, who was still bound hand and foot, outside to the front of the van. At this time, Riddle said, "It's cold. Why is it so cold." It was still snowing. Willis gave a knife to Thorpen and said, "Here, you do it." Thorpen stabbed Riddle in the neck. Thorpen testified at trial that then appellant took the knife away from him and also stabbed Riddle in the neck, saying, "That's not how you do it. It's like this." Appellant testified that he did not stab Riddle in the throat, but that Thorpen had stabbed him

twice. Appellant and Thorpen then dragged Riddle's body away from the road. They returned to the van, shut the doors and turned off the lights until an approaching car passed them, then they drove away.

Appellant argues that his theory of the case was that Riddle's death was due to injuries resulting from his head being hit against the console of the van; that such was necessary to prevent an automobile collision and to save their lives; and that appellant had not participated in the throat-slashing incident. Appellant therefore requested various instructions, including instructions on self-defense and lesser included offenses, based on the premise that appellant acted in self-defense in hitting Riddle's head against the console, and either he died from those blows, in which case the defense would be self-defense, or he did not die, in which case the lesser included offense of assault and battery would apply.

However, the judge observed that appellant was charged with murder not assault, and that the murder charges arose out of the injury to the throat, not the blows to the head. The trial judge said in this regard:

> " * * * It's uncontroverted to me as the judge that the decedent, Jerry Riddle, died of loss of blood from having his throat cut. * * * If the defendant did not participate in slitting his throat * * *, he should be acquitted. Just that simple. That's the basis of the instructions."

The jury decided the factual question as to who had slit Riddle's throat against appellant. There was adequate evidence for such finding.

Appellant testified that Willis stopped the van to bring Riddle out of his unconscious state. He testified,

> "A. It was to get him out, to get Mr. Riddle out and get him walking around and what have you so that we could bring him out of it, you know, maybe get him out in the cold and he would respond.
>
> *     *     *     *     *     *

"Q. Was he still—what was his condition then?

"A. He was semi-conscious.

"Q. Why do you say 'semi?'

"A. Because he was mumbling, 'It's cold out here. Why is it so cold?'"

Appellant testified that Mr. Riddle was moved to the front of the van, and appellant took his arm to "start taking his pulse," and looked at his eyes and saw no response. He did, however, get a "faint" pulse. "I might have, I don't know. It felt like I had a pulse but—." Then he reached into his pocket for a watch to count Riddle's pulse, but before he could do that:

"A. I looked up and I saw Thorpen bending down and he thrust a knife into his throat, withdrew it, and in a slashing motion slit his throat again."

There is testimony in evidence that the group was concerned with Riddle dying after appellant had hit his head against the van's console. However, even appellant testified that Riddle was talking as they took him out of the van, and that he thought he found a pulse seconds before Thorpen stabbed him.[1]

A pathologist, who qualified as an expert witness, testified on direct examination that the cause of death was a severed carotid artery.

"A. As a result of this cutting or transection of the carotid artery, as I mentioned, a great deal of bleeding or hemorrhage would occur. This is a lethal type of injury because it's a high pressure vessel and the blood does leave the vascular system relatively rapidly. This individual bled to death from this injury.

"Q. From what injury?

"A. The cutting of the carotid artery by the wound on the left side of the neck."

When asked about a bruise on the victim's head, the pathologist testified:

"A. As I mentioned, part of the internal examination was removing the skull cap,

examining the brain, the vascular structures, soft tissue of the head. The wound to the left periatal [sic] area, the left side of the head again was very superficial. It was just a bruise in the soft tissue. There were no fractures of the skull, there was no significant degree of injury to the brain or any other structures. It was not a lethal injury in any way, shape or form."

Bonnie Whaley, on direct examination testified that Riddle was alive before he was removed from the van. Thorpen had testified on cross-examination that he thought Riddle was already dead before he stabbed him, but based only on the fact that Riddle had been fading in and out of consciousness since the blows to the head, and because he looked "lifeless" while lying in front of the van.

This falls short of competent evidence to warrant instructions on self-defense. The pathologist's testimony, coupled with the evidence that Riddle was talking moments before his throat was slashed, in addition to appellant's own testimony that he thought he found a pulse seconds before the knife wounds were inflicted dispels any notion that the victim was dead before he was stabbed.

The trial court summarized the effect of the evidence at the instruction conference:

"THE COURT: Well, you know, Riddle's hands were tied, his feet were tied, he was taken out of the van and killed by someone. And how self-defense can come into it when his hands are tied and feet are tied and taken outside the car by two or three people outside the van, I don't understand how self-defense comes into it."

Even if this were not the case, we would be compelled to hold that the evidence surrounding the head-hitting incident does not give rise to the defense of self-defense.

In *Garcia v. State*, Wyo., 667 P.2d 1148 (1983), there are collected Wyoming cases

---

1. Thorpen had testified that appellant had administered the second and more severe of two stab wounds. However, whether appellant or his partners in crime stabbed Riddle is not perti-

nent to the theory of self-defense. Only if Riddle died from the blows to the head does that theory come into play. Appellant cannot logically contend that the stabbing was self-defense.

dealing with self-defense in homicides. In composite, they hold that to excuse a homicide on the grounds of self-defense, one must establish the following: (1) that the slayer was not at fault in bringing on the difficulty; (2) that he believed, at the time of the killing, that he was in such immediate danger of losing his own life, or of receiving serious bodily injury, as made it necessary to take the life of his assailant; (3) that the circumstances were such to warrant reasonable grounds for such belief in the mind of a reasonable man; (4) that there was no other reasonable method of escaping or otherwise resolving the conflict. 40 Am.Jur.2d Homicide, § 140, p. 431. The right to kill in self-defense exists only in extremity; there must be no other practicable means to avoid the threatened harm. To successfully assert self-defense, the defendant must have no other reasonable means of avoiding death or injury. 40 Am.Jur.2d Homicide, § 151, p. 439.

"A slaying committed after the danger has ceased to exist cannot be excused on the ground of self-defense. A person loses his right to shoot again in self-defense after firing a shot which has so disabled his assailant that there is no longer any apparent danger. * * *" Id. at p. 440.

"It is a well-established rule that in order to justify or excuse a homicide on the ground of self-defense, the slayer must have employed all means in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life in order to protect himself. * * *" Id. at § 160, p. 447.

Appellant testified that the van was traveling on a slick highway. He said, "The van would slip around on the road every once in awhile." When Riddle placed a choke hold on the driver's neck, appellant felt the occupants of the van were in danger, "[b]ecause at any time the van could have flipped off the road and could have killed everyone in the van." Appellant then testified:

"I then proceeded to grab Mr. Riddle. And in doing so, I done almost exactly the same thing he did. I grabbed him around the neck like a headlock kind of thing, and I pulled him off Mr. Willis, and at the same time I had hit his head on the console twice."

In response to the question of whether or not the van was moving at the time he hit Mr. Riddle's head, he answered, "No. I think at the same time I had started hitting his head the van had stopped."

■ So according to appellant's own testimony, which was corroborated by that of Mr. Thorpen, the van was stopped at the time he was hitting the victim's head against the console. The defense of self-defense can only be used when there are no other alternatives but to kill the assailant. Here there were a myriad of other alternatives. Appellant testified that he already had Riddle in a headlock. At that point there was no reason to kill Mr. Riddle. In addition, Willis was already stopping, and had in fact stopped the van by the time appellant pulled Riddle off of him, so the danger of injury from an automobile accident was being taken care of by means less severe and permanent than homicide. No matter how we analyze this case, the theory of self-defense was not relevant. *Cullin v. State*, Wyo., 565 P.2d 445 (1977); *State v. Eldredge*, 45 Wyo. 488, 21 P.2d 545 (1933).

There is no competent evidence to establish that Riddle was dead before his throat was slashed, but even if there were, there is no evidence that Riddle's actions in the van were of the magnitude to give rise to the submission of the defense of self-defense to the jury. The trial court correctly refused to give such instructions.

Affirmed.

ROSE, Justice, specially concurring.

I will concur in the result reached by the majority opinion, based on the evidence that Riddle died from a severed carotid artery rather than from a blow to the head. The majority conclude, and I agree, that no self-defense instruction was warranted where the evidence established that Riddle died from two stab wounds received while

he was in a partially conscious state and bound hand and foot. Instead of stopping at this point, however, the majority go on to hypothesize:

> "Even if this were not the case, we would be compelled to hold that the evidence surrounding the head-hitting incident does not give rise to the defense of self-defense."

In concluding that the trial court properly refused to instruct on self-defense even if death resulted from the blows to the victim's head, the majority make assumptions and rulings not relevant to the resolution of the issue raised by this appeal. While I don't wish to fall into the trap of arguing with dicta, I am sufficiently concerned about this court's concept of self-defense to articulate my objections to the following erroneous propositions in the majority opinion:

> " * * * The right to kill in self-defense exists only in extremity; there must be no other practicable means to avoid the threatened harm."

> " * * * The defense of self-defense can only be used when there are no other alternatives but to kill the assailant."

The existence of alternatives to homicide does not prevent the assertion of self-defense but goes to the reasonableness of the defendant's belief that he was in imminent danger of death or great bodily harm. This court said in *Garcia v. State*, Wyo., 667 P.2d 1148, 1152 (1983):

> " ' * * * To justify a homicide, it must appear that the slayer was in great peril of death or serious bodily harm, or had reasonable ground for believing and did believe, that he was in such peril and that the killing was necessary to avert such peril, and that no other reasonable means of avoiding it was open to him. * * * ' " Quoting from *Durham v. State*, 29 Wyo. 85, 210 P. 934, 938 (1922).

The Wyoming Pattern Jury Instruction on self-defense encompasses this concept and states:

> " * * * [H]is right of self-defense is the same whether the danger is real or merely apparent,"

with the following Comment:

> "The defendant must believe that the threatening danger is imminent, but the danger does not have to be imminent in fact. *Parker v. State*, 24 Wyo. 491, 161 P. 552, 555 (1916).

> "To claim self-defense, the defendant's belief as to the necessity of defending himself must have been based on reasonable grounds. A subjective belief does not by itself entitle defendant to use the justification of self-defense. *Loy v. State*, 26 Wyo. 381, 185 P. 796, 799 (1919).

> "When the evidence presents the theory of apparent danger, 'an instruction which limits the right of self-defense to actual or real danger alone is erroneous.' *State v. Radon*, 45 Wyo. 383, 19 P.2d 177, 182 (1933)."

The question of reasonableness of the defendant's belief is, of course, for the jury. *Parker v. State*, 24 Wyo. 491, 161 P. 552 (1916).

It seems to me that the foundation predicate for these majority-opinion propositions is that, before the accused may justifiably employ deadly force in self-defense, he must have in fact been in actual danger of death or great bodily harm. How else could it be said,

> " * * * [T]here must be no other practicable means to avoid the threatened harm."?

Or how else could it be said that the use of deadly force in self-defense could only be employed

> " * * * when there are no other alternatives than to kill the assailant."?

These statements must logically contemplate the "threatened harm" of an *actual, on-going danger* presenting "no other alternatives" to homicide.

In order for the accused to assert the right of self-defense, he need not have faced an actual danger of imminent harm with respect to which *this* court can discover no means of avoidance short of homi-

cide. *It is only necessary that the defendant reasonably believed that he was in danger because of some act which gave the appearance of imminent danger.* See my dissent in *Jahnke v. State,* 682 P.2d 991, and cases cited therein. In *State v. Radon,* 45 Wyo. 383, 19 P.2d 177, 182 (1933), the deceased, with a package in his hand which contained two gloves, started walking toward the defendant, and the testimony was that Radon believed that the package contained a gun. Acting upon this belief, he shot and killed the victim. Thus—there was neither a threat of assault, an actual assault, nor actual danger of imminent harm, yet this court reversed for giving to the jury instructions which said in relevant part:

> " 'The jury is instructed that in order to excuse the defendant on the ground of self-defense, *there must be some act* or declaration at the time of the killing of the person *on the part of the deceased to kill him or to do him great bodily harm'* " (emphasis added), 19 P.2d at 181,

and an instruction which said:

> " *'The danger* which will justify the killing of a human being *must be actual,* present and urgent, and appear to a reasonable mind to be actual, present and urgent.' " 19 P.2d at 181.

We held that it was error to direct that, in order for the jury to resolve the reasonableness issue it must first appear that the victim tried "to kill him or to do him great bodily harm," and that the danger to the defendant "must be actual."

Thus, where the evidence supports the self-defense theory of *apparent danger,* an instruction which limits the right of self-defense to actual or real danger alone is erroneous. Furthermore, the right of self-defense ends only when it reasonably appears to the accused that the danger has ceased. *State v. Goettina,* 61 Wyo. 420, 158 P.2d 865, 878 (1945).

I object to the aforementioned statements contained in the majority opinion because the existence of alternatives to homicide does not prevent the assertion of self-defense but goes to the reasonableness of defendant's belief that he was in imminent danger.