THE STATE OF OHIO, APPELLEE, v. TOWNS, APPELLANT.

[Cite as State v. Towns (1973), 35 Ohio App. 2d 237.]

(No. 72AP-285—Decided June 26, 1973.)

Mr. George C. Smith, prosecuting attorney, and Mr. Eugene P. Weiss, for appellee.

Messrs. Knepper, White, Richards & Miller and Mr. R. Douglas Wrightsel, of counsel, for appellant.

STRAUSBAUGH, J. This is an appeal from a conviction in the Common Pleas Court of Franklin County of the defendant for a violation of R. C. 2901.13, armed robbery.

The facts, as indicated by the record, are that about 9:30 a. m. on December 10, 1971, John Butler, the manager of Sandy's Drive-In on Mt. Vernon Avenue, was found in the basement of the drive-in, by two employees arriving to begin their work, critically wounded with two .32-caliber bullet wounds in his head. The office had been ransacked; the file cabinet had been opened, with papers strewn over the floor; and the safe was standing open with $100 in petty cash missing. Kathy McFann testified that

sometime during the morning of December 10, 1971, the defendant, whom she identified, took her and a girl by the name of Judy to the Western Union office to pick up $25, which Capp Anderson, the pimp she worked for in Landover, Maryland, had sent to her. At that time, she testified, the defendant said that he did not want to ride around downtown to different stores because "his car was hot because he used it in a robbery" and that he and Jimmy Raymond had robbed this man at Sandy's Drive-In on Mt. Vernon Avenue. She further testified that later that day the defendant and two of his friends drove her to Landover, Maryland, the trip taking about twelve hours, and they arrived in Landover about 1 a. m., December 11, 1971.

Ronald G. Nulle testified that in the early morning of February 11, 1972, at the request of Ron Price of the Columbus Police Department, he had a conversation with the defendant regarding a robbery that Nulle was supposedly planning that would take place in about another week. He stated that the defendant said he needed some money. Nulle asked him the following questions: "Was he qualified? What could he do? Did he know anything about armed robbery as such?" Nulle further asked him: "Did he have any heart? What would he do under pressure if a robbery occurred? got under pressure, did he have—could he just take care of himself in an armed robbery?" Nulle then testified: "That is when he told me about the first robbery that I mentioned and started talking about the second, which was the Sandy Drive-In robbery." Nulle further testified that the defendant stated:

"The way they had planned to take it off was to pull up in the alley behind Sandy's, but off to the side eight feet, I haven't been in the area myself, planning to pull up there waiting for the manager to come in that morning in the drive-in and catch the manager before he could get in the building, and take him then. * * * He said they missed the manager going into the place and so they decided to go and knock on the back door and the manager came to the door and asked what they wanted and like then they said

they wanted to put an application for a job, and while they went in and when they pulled pistols on him then, and the man Joe, never did say his name, they got in a hassle and they had a fight, you know, Joe came between them and tried to separate them and it went off, Joe said he grabbed the gun and it went off.''

William Rush, who identified the defendant in court, testified that between 7:30 and 8 o'clock a. m., December 10, 1971, he saw the defendant with two other men sitting in the Brassfield Grocery in the 900 block of Mt. Vernon Avenue about a block and a half from Sandy's Drive-In.

The defendant and his wife each testified that the defendant was home in bed with his wife all night and did not get up until approximately 9:30 a. m., December 10, 1971; that he did not leave the house until 9:30 or a quarter of 10 that morning.

Trial in the common pleas court was to a jury, which returned a verdict of not guilty to the charge of murder in the first degree (R. C. 2901.01) and guilty of armed robbery (R. C. 2901.13), from which judgment this appeal is taken.

Defendant's first assignment of error is:

"The trial court erred in overruling defendant's motion to dismiss the armed robbery count of the indictment at the close of prosecution's case." A review of the evidence indicates that the prosecution during its case presented a prima facie case upon which reasonable minds could differ and from which the elements of the charge of armed robbery were established by sufficient evidence to warrant the findings of guilty by a jury. As stated above, the prosecution proved that a crime had been committed; the defendant was identified as being within one and one-half blocks of the scene of the crime shortly before it took place; and he stated to two different persons that he committed the crime. There being a question of credibility of witnesses, a question of fact for the jury presented itself. We therefore find no error committed by the trial court in overruling defendant's motion for a directed verdict.

Defendant's second assignment of error is:

"The trial court erred in giving an improper charge on aiding and abetting, and in failing to give the charge requested by defense counsel." The court charged the jury as follows:

"If you find that an armed robbery was knowingly committed by two or more persons, only one of whom used a dangerous weapon, each person participating is guilty of armed robbery.

"Any person who aides [sic], abetes [sic], or procures, another to commit an offense, may be prosecuted and punished as if he were the principal offender. A person who knowingly aides [sic], helps, assists, encourages or directs another in the commission of a crime is regarded as if he were the principal offender and is just as guilty as if he personally performed every act constituting the offense.

"When two or more persons have a common purpose to commit a crime and one does one part and a second performs another, those acting together are equally guilty of the crime."

At the end of the charge the court inquired whether there were any additions for the defense. Defense counsel responded as follows:

"I don't think Judge that you stated that for aiding and abetting you must find beyond a reasonable doubt that there were two or more persons involved in the aiding and abetting statute.

"* * *

"One element there must be two or more persons.

"* * *

"In other words you say first a person is guilty of aiding and abetting you must find two or more persons there.

"* * *

"There must be two or more persons, one of the elements has to be beyond a reasonable doubt.

"I am saying that you should charge the jury that they must find from proof beyond a reasonable doubt that there were two or more persons involved before you can find him guilty as an aider or abetter." The court refused to give the charge.

Defense counsel first argues that the charge was improper because there was no showing that a principal was guilty, basing his contention upon a statement by the court in *State* v. *Isaacs* (1970), 24 Ohio App. 2d 115, at page 121. Later, in the same paragraph, on the following page, the court goes on to say: "* * * This does not mean that the principal has to be tried in the same case, or, for that matter, that he must be tried and convicted at all. It merely means that before there can be an aider and abettor to a crime there must be proof that the crime to which the aiding and abetting pertains has been committed."

R. C. 1.17 provides: "Any person who aids, abets, or procures another to commit an offense may be prosecuted and punished as if he were the principal offender." The defendant herein was indicted and charged on both counts, murder in the first degree and armed robbery. At the trial there was evidence that more than one individual participated in the commission of the offenses. There was sufficient evidence to support the finding that the defendant was a principal rather than an aider and abettor. There was ample proof that the crime of armed robbery had been committed. The fact that the co-perpetrator of the crime of armed robbery was not apprehended and tried in no way precludes the trial and conviction of the defendant herein.

The defendant next argues that the charge given by the court does not clearly show the need for finding knowledge on the defendant's part. The defendant quotes the first sentence of the second paragraph to show this. However, the second paragraph is as follows: "A person who *knowingly* aides [sic], helps, assists, encourages or directs another in the commission of a crime is regarded as if he were the principal offender and is just as guilty as if he personally performed every act constituting the offense." (Emphasis added.) The last paragraph on that page is the instruction of the trial court defining the word "knowingly." We find that the charge given by the trial court required the jury to make a finding of knowledge on the part of the defendant.

Defendant next argues that the charge requested by

defense counsel at the conclusion of the court's instruction to the jury was proper, and that the court refused to give it. The defendant argues that at the conclusion of the court's instructions, the court refused to "clarify its charge on aiders and abettors to show that a finding of aiding or abetting requires finding beyond a reasonable doubt that two or more persons were involved in the alleged offense." R. C. 2945.10(E) provides: "When the evidence is concluded, either party may request instructions to the jury on the points of law, which instructions shall be reduced to writing if either party requests it." Referring to that section, the syllabus in *State* v. *Barron* (1960), 170 Ohio St. 267, states that: "* * * it is not mandatory upon a trial court to give any instructions to the jury in a criminal case before argument, but, if requested special instructions, reduced to writing, are correct, pertinent and timely presented, they must be included, at least in substance, in the general charge." In the instant case, we find that the special instructions requested by defense counsel were not reduced to writing and were not timely presented. Moreover, we find, as the Supreme Court did in *State* v. *Barron, supra,* that the trial court gave a complete and comprehensive charge embracing all the elements appropriate to the case. Defendant's second assignment of error is overruled.

Defendant's third assignment of error states: "The trial court erred in admitting the polygrams from the lie detector test taken by the defendant and in admitting Officer Cummins' testimony with reference thereto."

In the absence of a stipulation, courts have almost uniformly rejected the results of lie detector tests when offered in evidence for the purpose of establishing the guilt or innocence of one accused of a crime, whether the accused or the prosecution seeks its introduction. The reason for this is the contention that the lie detector test has not as yet attained scientific acceptance as a reliable and accurate means of ascertaining truth or deception. Annotation, 23 A. L. R. 2d 1306 at 1308. See, also, 22A Corpus Juris Secundum 525, Criminal Law, Section 645(2); 29 American Jurisprudence 2d 923, Evidence, Section 831.

Although, in the absence of stipulation, an examination of texts and the cases indicates that the results of a lie detector test are not ordinarily admissible (15 Ohio Jurisprudence 2d 718, Criminal Law, Section 310), and for the same reason the willingness or unwillingness of a party or a witness to take a lie detector test is not admissible against a party and therefore constitutes prejudicial error (*State* v. *Smith* [1960], 113 Ohio App. 461; *State* v. *Hegel* [1964], 9 Ohio App. 2d 12), where there has been a stipulation that the results of lie detector tests may be used in evidence, the text writers and cases have held that such results are admissible. 29 American Jurisprudence 2d 924, Evidence, Section 831; see, also, Notes, 21 Fla. L. Rev. 541, 544. The defendant stipulated that the results of the polygraph test would be admissible at trial. Now, on appeal, defendant argues that the results are inadmissible. The defendant should not now, on appeal, be permitted to take advantage of his former stipulation and obtain a reversal of his conviction because defendant entered into the stipulation and failed to object at the time of trial. Merely because the results of the tests were unfavorable and the jury returned a verdict of guilty does not permit a defendant to take advantage of that to which, up to the point of appeal, he has apparently assented.

In the present case we have in the record State's Exhibit No. 24, "Entry of Stipulation of Use of Polygraph Test(s)." It states as follows:

"It is hereby agreed by and between counsel for the State of Ohio and counsel for the defendant * * * and by and between the aforementioned parties and the defendant, Joseph L. Towns, himself, that the defendant will submit to a 'Polygraph Test' or tests, the subject matter being the homicide of John Butler and robbery of Sandy's Drive-In Restaurant which occurred December the Tenth of Nineteen Hundred and Seventy-One at the location of 850 Mt. Vernon Avenue in the City of Columbus, State of Ohio, to determine any knowledge or complicity of the aforementioned offenses. The 'Polygraph Test or Tests' to be administered by a person or persons duly qualified to administer such test(s) and acknowledged by all parties to this agree-

ment to be qualified to administer this test or these tests and to testify at trial of this cause as an 'expert' or as 'experts' regarding all aspects of the test(s) as given.

"It is further agreed among all parties that the 'results' of the polygraph test(s) or examination(s), including the complete testimony of the person administering same to the defendant, shall be offered and received as evidence in the trial of this cause without objection of any kind by any party to this agreement. It is understood that the defendant has been fully advised of his rights under the Ohio and United States Constitutions prior to his agreeing to submit to such test(s) and knowingly and intelligently waives his right to remain silent and his right to seek the advice of counsel during any stage of the administration of the polygraph test(s) or examination(s).

"It is further understood by all parties that upon signing this entry of stipulation of use of polygraph test(s) and results in evidence, all parties and their successors in interest (i. e., such other counsel as the State of Ohio or the defendant may retain or employ for any subsequent trial which may result through the investigation of the subject matter of this cause) shall be mutually bound to the terms of said entry and the refusal of any party to submit to any portion of said entry shall be subject to comment by the other parties at any subsequent trial of this cause.

"It is also understood that the place and date of examination(s) of the defendant will be arranged and designated by counsel for the State of Ohio. The 'expert' or 'experts' who will examine the defendant will be selected from the Columbus Police Department and will be designated by counsel for the State of Ohio."

The defendant first argues that the polygraphist testing the defendant was not a qualified expert for the reason that Cummins was not certified until May 1972, although the tests administered defendant were conducted February 18, 1972. An examination of the record discloses that defense counsel at the time of trial, who was different counsel than for purposes of this appeal, made no objection to the testimony of the qualifications of Officer Cummins at the time of

trial, or to the testimony of the officer. An examination of the record discloses evidence that Officer Cummins had extensive training and experience in this field, which would qualify Officer Cummins as an expert. In other words, based upon the stipulation and the testimony as to the background of the officer, the witness was competent to testify. The weight given to his testimony would depend upon his knowledge, training, and experience in the field.

The defendant next argues that he was shown gory pictures of the death scene and told that he might as well admit it as "we have a warrant for your arrest." This statement was denied by Officer Cummins, and an examination of the photographs discloses no pictures taken of the victim. The pictures in question were black and white photographs, taken apparently after the victim had been removed. We do not find that the test was improperly conducted. The third assignment of error is overruled.

Defendant's fourth assignment of error states:

"The trial court erred in admitting the polygrams and testimony of officer Cummins, with reference thereto from the lie detector test given to Kathy McFann."

The question concerning the running of a polygraph test upon Kathy McFann was originally asked by defense counsel in his cross-examination of Officer Cummins. Defense counsel then asked if the officer had the results of such test. For counsel to ask such questions without proceeding further is to create an unfair prejudice against the prosecution for whom Officer Cummins was a witness. Although the stipulation entered into by the defendant and the state of Ohio in State's Exhibit No. 24 related specifically to the defendant, the stipulation referred to polygraph tests in the plural. It is suggested that where evidence was introduced to the effect that a party had submitted to a lie detector test, the court may, in its discretion, admit evidence of the results of the test, at least to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence. 32 Corpus Juris Secundum 723, Evidence, Section 588(4). By raising the question initially, defendant opened the door

to the introduction of the results of such tests upon Kathy McFann. Defendant cannot, therefore, claim prejudice when, by the stipulation, he has waived the question relating to reliability of the polygraph tests.

While we do not alter the general rule throughout the United States that results of a lie detector test are inadmissible, we do find that, where the parties stipulate in writing to take such tests and be bound thereby, and where, pursuant to such stipulation, such test is properly given, the results of such tests are admissible at trial. We further find that, where evidence is introduced by one side that a person has submitted to a lie detector test, the court in its sound discretion may admit evidence of the results of the test, to the extent necessary to remove prejudice which may ensue from the introduction of the original evidence. The fourth assignment of error is overruled and the judgment is affirmed.

*Judgment affirmed.*

REILLY and WHITESIDE, JJ., concur.

WHITESIDE, J., concurring separately.

Although I concur in the judgment of affirmance, a further explanation of the polygraph issues is necessary, though I essentially agree with the discussion in the majority opinion concerning the first two assignments of error.

By the third assignment of error, defendant contends that the trial court erred in admitting the polygrams from the lie detector test taken by defendant and in admitting Officer Cummins' testimony with reference thereto.

While an objection was made to the admission of the polygrams, the testimony was admitted without objection. Furthermore, prior to the administering of the polygraph test, defendant consented thereto and expressly agreed that the results of the test including the complete testimony of the person administering the test could be offered and received as evidence at the trial. Under similar circum-

stances, this court held in *State* v. *Manning,* Court of Appeals for Franklin County, No. 72AP-79, April 3, 1973, that there is no prejudicial error in the admitting into evidence of a lie detector test taken by a defendant in a criminal case where the defendant does not object to such admission, and has expressly stipulated that the test can be admitted in evidence.

However, we indicated in *Manning* that such tests are ordinarily not admissible into evidence. In fact, the courts of this country almost universally hold that lie detector tests are not competent evidence and thus are inadmissible. See Annotation, 23 A. L. R. 2d 1306.

There are those who urge that lie detector tests be admitted into evidence at least on a limited basis. In McCormick, Evidence, page 100, it is stated: "These devices offer interesting possibilities for the appraisal of the credibility of testimony—possibilities which have been widely realized in out-of-court investigations, and which may to some extent in the future be directly utilized by the courts." McCormick further states, at pages 372-373:

"In the light of these findings, it is believed that the courts' wholesale exclusion of lie-detector test-results, for want of scientific acceptance and proved reliability, is not supported by the facts. Many courts can easily recede from this position, in a case where the foregoing facts as to acceptance and reliability are adequately proven by the expert himself as a foundation for his testimony giving the test-results. * * *

"It is believed that the courts should meet the need for this new resource for fact-finding and minimize the dangers, by substituting for the rule of exclusion a standard of discretion, and by holding accordingly that the judge may in his discretion admit expert testimony giving the results of a test of an accused or other witness, offered by the state or the accused or by a civil party when the judge finds (a) that the expert is highly trained and experienced, and (b) that the probative value outweighs the danger of prejudice, confusion and waste of time."

At the present time, I see no reason to recede from the

almost universal holdings of courts that lie detector results are inadmissible. Such a determination should be undertaken in evaluating and adopting rules of evidence rather than on a case-by-case basis by the courts.

However, even if we were to find that lie detector tests can in some instances be properly admitted into evidence without an agreement therefor, a basic limitation must be placed thereon. At the very most, a lie detector test only tends to indicate whether or not the person examined is truthfully answering a question. Since this is the case, the only possible proper use of a lie detector test would be for impeachment purposes.

Therefore, even if lie detector tests were admissible in evidence, their only purpose would be as an aid in testing the credibility of a witness. Accordingly, evidence of a lie detector test could not be considered as substantive evidence of the guilt or innocence of a defendant in a criminal case. Such evidence of a lie detector test taken by a defendant in a criminal case would be admissible only for the impeachment of testimony by the defendant if he chose to testify. Such test would not be admissible if the defendant did not testify and would not be admissible as part of the prosecution's case to prove the guilt of the defendant.

Furthermore, the basic portion of the lie detector testimony is the conclusions of the person administering the test, from his interpretation, as to whether or not the witness is telling the truth. This obviously invades the province of the jury upon the issue of credibility. Unlimited use of lie detector tests would tend to lead to trial by lie detector test rather than trial by jury, which the Constitution provides shall be inviolate.

On the other hand, the admission of the actual results of the test without the opinion of the person administering it, but with an explanation of what various reactions tend to indicate, might serve as an aid to the jury in determining credibility. Accordingly, there can be no prejudice, from the admission into evidence of the polygrams, that was not already created by the testimony concerning the lie detector test.

It is my conclusion, under the present state of the law, that the admission into evidence of the results of a lie detector test administered to a defendant in a criminal case tends to constitute an invasion of the constitutional right to trial by jury. However, the right to trial by jury can be waived. To the extent that the admission of the lie detector test results constituted an invasion of any of defendant's constitutional rights, including that of trial by jury, such rights were waived in this case by the stipulation.

The fourth assignment of error presents a slightly different problem. The trial court, over objection of defendant's counsel, permitted evidence concerning the results of a lie detector test administered to one of the witnesses testifying against defendant.

As pointed out in the majority opinion, the first reference to this lie detector test was made in the cross-examination of the person who administered the test. The majority concludes that this opened the door for the admission into evidence of the results of the test upon redirect examination. This principle is sometimes referred to as the curative admissibility rule.

This doctrine is usually applied in situations where one party offers evidence which is inadmissible and the trial court overrules an objection interposed thereto; the other party is then permitted to introduce similarly inadmissible evidence to combat the prejudice created by the original inadmissible evidence.

In this case, the prosecutor did not object to the introduction of the inadmissible evidence by defendant. A party cannot, however, sit back, permit inadmissible evidence to be admitted without objection, and then take advantage of the situation to introduce inadmissible evidence much more prejudicial in nature.

In this instance, however, the evidence elicited by defense counsel on cross-examination tended to give the jury the impression that the lie detector test given to the prosecution witness indicated that she was not telling the truth. See *State* v. *Smith* (1960), 113 Ohio App. 461. Under such circumstances, the state should be given the opportunity

to correct such an erroneous impression of the jury. It could also be argued, however, that because of the failure of defense counsel to ask what the results of the test were, the jury would be more likely to be given the impression that the lie detector test indicated the witness was telling the truth.

However, the determination of whether the inadmissible evidence is sufficiently prejudicial to the other party as to permit such other party to combat it by equally inadmissible evidence, lies within the sound discretion of the trial judge. Here there was no abuse of that discretion.