Diana Kaye CULLIN, Appellant
(Defendant below),

v.

The STATE of Wyoming, Appellee
(Plaintiff below).

No. 4674.

Supreme Court of Wyoming.

May 26, 1977.

Gerald M. Gallivan, Director, Wyoming Defender Aid, and Brian C. Bjorndahl, law student, Laramie, signed the brief and Brian C. Bjorndahl, appeared in oral argument on behalf of appellant.

V. Frank Mendicino, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Crim. Div., and Frank R. Chapman, Asst. Atty. Gen., Cheyenne, signed the brief and Frank R. Chapman, appeared in oral argument on behalf of appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

RAPER, Justice.

The defendant-appellant was found guilty of second degree murder by a jury and sentenced to a penitentiary term of not less than 25 nor more than 35 years for the shooting death of Ronald Wayne Palmer on July 12, 1975. She raises several issues, rearranged in the order we shall dispose of them:

1. Was the court's instruction on provocation proper in the light of the evidence?

2. Was the court's instruction on intent proper?

3. Was the trial judge in error in refusing offered defense instructions covering the so-called *Eagan* rule, conduct and demeanor of the defendant after the crime and that if conclusions of both guilt and innocence can be reasonably drawn from the evidence, the defendant should be acquitted.

4. Was it prejudicial error to admit testimony regarding a polygraph examination, even though by stipulation and without a special instruction?

5. Was the evidence sufficient to show beyond a reasonable doubt that the defendant did not act in self-defense and sustain a verdict of second-degree murder?

We will affirm.

The defendant and the decedent, Ronald Wayne Palmer, had been living together as man and wife, though not married, for about two years prior to the homicide for which defendant was convicted and sentenced. Their relationship had become somewhat strained and on the evening preceding the date defendant murdered him, the victim Palmer and she, according to her testimony, had engaged in a heated argument.

The testimony of the defendant is the only source of evidence to establish events immediately preceding what accelerated into critical facts during the evening of July 11 and the early morning hours of July 12, 1975, finally ending in Palmer's death. According to her, after arrival at their mobile home at Powell, Wyoming, following Palmer's day's work, he consumed a quantity of whiskey and announced he was going to a downtown bar. Defendant, an entertainer, offered to take him, saying she needed the car to attend a singing engagement at Lovell, Wyoming. Palmer refused the offer, took the car keys from her purse and went to the bathroom, carrying his handgun and holster. While he was there, defendant went and got a spare set of car keys she secretly kept and told her small children by a previous marriage, living with them, to slip down to the other end of the mobile home park lane. She picked up the youngsters and drove to the Powell police station to press an assault charge she was urging against Palmer, arising out of a "family" fight which arose between them a few days previous.

From that point on, other persons are drawn into the scenario of events that transpired. At that juncture, their testimony begins to conflict with the story told by the defendant in her defense. At such a point, we follow the appellate practice of accepting as true the evidence favorable to the prosecution, leaving out of consideration entirely evidence of the unsuccessful defendant in conflict therewith and giving evidence of the State every favorable inference which may be reasonably and fairly drawn. *Dryden v. State,* Wyo.1975, 535 P.2d 483; *Shafsky v. State,* Wyo.1974, 526 P.2d 60; *Bentley v. State,* Wyo.1972, 502 P.2d 203; *Sims v. State,* Wyo.1972, 496 P.2d 185; *Harris v. State,* Wyo.1971, 487 P.2d 800; 3 West's Wyoming Digest, Criminal Law, Key No. 1144.13(3). The evidence will be treated in that manner whenever mentioned in this opinion.

The radio dispatcher on duty at the police station when defendant arrived, testified that defendant, in an upset and nervous condition, told her that Palmer had a gun and was going drinking. The dispatcher also testified that defendant said she also had a gun and would shoot Palmer if he came after her, since she had been informed she had a right to defend herself.

After assuring herself that Palmer was not at home, she returned to pick up some clothes for the children, including their shoes, left in the hasty departure. She claimed $120.00 of her money was missing. She found an empty .357 handgun holster. The weapon was not on decedent at time of the shooting and was later recovered from where it had been hidden in the springs of a couch in the mobile home.

Appellant left and, in passing Clyde's Bar, saw the truck belonging to a friend of Palmer's, so stopped to see if Palmer was there, as well, purportedly to recover her $120.00. He was there playing pool with a friend. She asked for the money; accord-

ing to her, he advised he would give her the money if she would give him the car. Her planned trip to Lovell never materialized because defendant remained at Clyde's, where she sang a 45-minute set with the band. Janis Fritz, Marilyn Montz, with her husband, and Jennie Anderson came in about 11:30 p.m. Palmer started to talk with Janis. Defendant told Janis, "[t]hat's my husband, stay away from him!" Palmer asked Janis to dance which she refused because of the warning. Defendant then returned and said, "I told you to stay away from my husband." Palmer turned and said, "I'm not your husband, you fat son-of-a-bitch. Get away and leave me alone." They argued, a blow was struck by one or the other; Palmer's drink was spilled; defendant kicked at Palmer, called him a son-of-a-bitch and asked someone to "call the cops, Wayne just hit me in the stomach, I am pregnant." She was, in fact, not pregnant. After Palmer told her to go ahead and call the cops and to others present said, "she is just jealous," defendant blurted, "I will kill him, I will kill them both."

Decedent left the bar about midnight. Defendant told a customer with whom she was dancing, "That's the last time he will ever lay a hand on me." Defendant then went looking for Palmer, in and out of various bars. At the Pioneer, she learned that he and Janis had been there but had left together. Defendant returned to Clyde's, angrily grabbed Jennie Anderson, who had been with Janis, dragged her into the ladies' restroom and wanted to know about Janis.

Defendant went back to the mobile home, picked up a .22 revolver which she either placed on or under the car seat and drove off, claiming she was looking for a gas station. As she was driving slowly past King's Inn, she saw Palmer registering and Janis in a waiting vehicle.

The motel manager testified that at about 1:45 a.m. on July 12, he was awakened by Palmer wanting to register for a room for two. Palmer, with money in hand, suddenly turned and went out and the manager in a matter of seconds heard two shots in rapid succession almost simultaneously; he at once went out and approached a car only about 12 feet away, where he observed a man with his legs hanging out and upper torso in the car under the steering wheel. Defendant was sitting in the right-hand seat, door closed. The manager asked her, "Did you shoot that guy." She replied, "I didn't mean it. I didn't mean it." The car with Janis had been driven off when defendant drove up.

The police arrived shortly thereafter. Palmer, not yet dead, was taken to the Powell hospital and from there to a Billings, Montana hospital, where he died of a .22 bullet entering his head, directly between the eyes, glancing off the inside of his cranium and spending itself in the back of the brain, from which, during an autopsy, it was recovered. Defendant told police at the scene, "I shot him, but I didn't want him to die." Other facts will be related as they appropriately rise for discussion during the course of this opinion.

The defendant challenges the court's instruction on provocation as erroneous and prejudicial, in the light of the evidence, the defendant asserting that there was no evidence produced by the State by which the jury could find that defendant was the aggressor. The questioned instruction is as follows:

"You are instructed that the law does not permit a person to voluntarily seek or invite a combat in order that he may have a pretext to take the life of his assailant. The right of self-defense does not imply the right to attack, and it will not avail in any case where the accused voluntarily and of his own free will enters into and continues it. In this case if you believe from the evidence beyond a reasonable doubt that the Defendant voluntarily and of her own free will entered into and continued the encounter in question, until she fatally shot the deceased, then you would have no right to acquit the Defendant on the grounds of self-defense."

Defendant's testimony was that when she saw Palmer in the motel, she stopped, got

out of the car, went into the motel office and said, "This is my husband. Why are you renting a room with another woman?" She said she added as she went out, "[h]ave fun." It is her version that when she got into the car, got the keys in the ignition, Palmer was coming after her, she tried to roll up the window, he said, "I am going to kill you, you bitch. You will never embarrass me again," he came into the car, with his body pressed her into the corner on the passenger side and started choking her until her tongue was hanging out, her breath was almost gone and her eyes hurting. It was then she related she was barely able to grope for the gun, pull it up and shoot him without aiming.

The difficulty with her story is that the motel manager testified she never came into the motel nor said what she claimed to have said and when he saw her, within moments, she was wearing glasses, contrary to her claim that they had been knocked off and a lens separated from their frames. Her clothing was not in disarray, her wig was apparently on straight and none of the wounded man's blood was on her or her garments. A physician's examination shortly afterwards showed no bruises or scratches around defendant's throat. Medical testimony was that there were no gun powder burns or marks around or in the wound. A ballistics expert testified that there was no evidence, after microscopic and chemical examination, of burned powder fragments on Palmer's hat, which he was apparently wearing, in that it had a bullet hole in the brim at about the point the bullet entered his forehead. Expert testimony was that powder residue would be evident up to a distance of about four feet, the conclusion being that the weapon, when fired, was over that distance from its target. A plausible conclusion, arising out of a reenactment of the scuffle in an automobile seat in the courtroom for demonstration, would be that if there was an attack and defense, such as she described, the defendant would have shot herself.

The jury answered the question as to why the defendant went to get the gun along with the motive and intent which can be inferred from the chain of events leading up to the confrontation at the motel. Before the shooting, the last likely place to see self-defense was at Clyde's a few hours earlier, when the deceased may have struck the defendant. It appears likely that the defendant stalked him down to do what she did. As against the defendant's claim of self-defense and the evidence, the court's instruction was proper.

The exact, same instruction here was one given by the trial judge in *State v. Flory*, 1929, 40 Wyo. 184, 198, 276 P. 458, 461. The defendant in that case armed himself to go after the deceased for an explanation, the defendant's wife having accused decedent of raping her. When confronted by defendant pointing a rifle, the defendant there explained that the victim, looking mean, sprang at him and before he knew it, the rifle went off and the man fell. This court found no error in the instruction and explained that a person who provokes or brings on the difficulty in which he kills his assailant cannot invoke the right of self-defense, unless he retreats as far as he safely can, making that fact manifest to his adversary.

In *State v. Radon*, 1933, 45 Wyo. 383, 400, 19 P.2d 177, 182, a similar instruction was indicated to be theoretically correct but the provocation was not considered as calculated to lead to the taking advantage of the deceased or to take his life or to do some great bodily injury. It depends upon whether the wrong was intended to produce an occasion to kill or produce bodily injury. The same rule was discussed in *State v. Bristol*, 1938, 53 Wyo. 304, 84 P.2d 757. In that case, even though an accused armed himself and went to a restaurant, where he met the deceased, whom he killed in an ensuing fight, the defendant was held to have not adequately provoked the decedent by a momentary glare and therefore retained his right of self-defense. It is initially the court's obligation to determine whether there is evidence before the jury from which it could infer that the defendant was at fault and be regarded as an

aggressor and deprive himself of the right of self-defense. *State v. Bristol, supra.* The instruction cannot be given as a matter of course in every case involving a claim of self-defense.

■ In the case before us, we hold that in the light of the defendant's threats to kill, her overpowering jealousy, arming herself and searching out the defendant, justified the court in instructing the jury, as it did, and it became a jury decision to finally determine whether defendant's provocation was calculated to create an occasion in order to afford her an opportunity to kill or seriously injure the deceased, whether the defendant's story of the scuffle was true or not. The physical facts, however, would indicate that no combat in the vehicle took place and she shot him as he entered the car. We would say the facts of this case closely parallel those of *State v. Flory, supra.*

■ The defendant urges error in the trial judge's instruction on intent and claims it was in conflict with the defendant's right to a continuing presumption of innocence. The allegedly offensive instruction was as follows:

"You are instructed that the intent with which an act is done, is an act or emotion of the mind, seldom, if ever, capable of direct and positive proof, but it is to be arrived at by such just and reasonable deduction or inference from the acts and facts proved as the guarded judgment of a candid and cautious man would ordinarily draw therefrom.

1. Section 6–55, W.S.1957, provides:

"Whoever purposely and maliciously, but without premeditation, kills any human being, is guilty of murder in the second degree, and shall be imprisoned in the penitentiary for any term not less than twenty years, or during life."

2. A special application of the presumption that one intends to produce the natural results of his actions is found in the deadly-weapon doctrine applicable to homicide cases: one who intentionally uses a deadly weapon on another human being and kills, presumably intends to kill him. LaFave and Scott, Criminal Law, § 68, p. 535. Use of a deadly weapon gives rise to a presumption of intent to kill. *State v.*

"The law warrants the presumption, or inference, that a person intends the result or consequences to follow an act which he intentionally commits, which ordinarily do follow such acts. The presumption may be rebutted by the accused."

There is no question but what intent is a necessary element of the crime of second-degree murder, a showing that the killing was done purposely and maliciously without premeditation.[1] Purposely means intentionally, *Nunez v. State,* Wyo.1963, 383 P.2d 726, 728.

■ Defendant made no objection to the instruction. In such a stance, there is ordinarily no reversible error. *Duran v. State,* Wyo.1976, 546 P.2d 434, citing *Oldham v. State,* Wyo.1975, 534 P.2d 107. In order to be considered, plain error must be shown. Rule 49(b), W.R.Cr.P. But the application of the plain-error doctrine must be exercised cautiously only in exceptional circumstances and must not be applied unless its denial would seriously affect the fairness, integrity or public reputation of judicial proceedings. *Hays v. State,* Wyo.1974, 522 P.2d 1004.

■ Defendant relies upon *Stuebgen v. State,* Wyo.1976, 548 P.2d 870. We do not consider it applicable or in point. In that case, the crime charged involved possession with intent to deliver a controlled substance. The controlled substance was never delivered. Here, the defendant did kill the deceased and a homicide was present. Stuebgen distinguishes such cases.[2]

*Brierly,* 1973, 109 Ariz. 310, 509 P.2d 203; *Moser v. State,* 1975, 91 Nev. 809, 544 P.2d 424.

The court in *State v. Greenwood,* 1967, 197 Kan. 676, 421 P.2d 24, held that evidence that defendant, after argument with fiance, purchased revolver, returned and shot her between the eyes creates an inference of malice and intent, the court stating a man is presumed to do that which he does and intends its consequences. In Montana, the jury is allowed to presume that defendant intended the ordinary consequences of his voluntary acts and, in a murder case, from the act of killing. *State v. Caryl,* Mont.1975, 543 P.2d 389. The design to kill is inferred from the act of killing. *Grimes v. State,* Okl.Crim.1961, 365 P.2d 739. Intent to kill may be presumed from evidence that a

■ In circumstances such as this murder case, use of the instruction given or one of a like sort is proper. While such an instruction is proper, prosecutors ordinarily are not content to rely upon the killing, alone, to prove intent. The State here did not rely upon any presumed intent and it was made abundantly clear by the court's other instructions that a heavy burden is placed on the State to prove every material fact beyond a reasonable doubt and that those of second degree murder are:

"1. That the deceased came to his death on or about the date charged in the Information;

"2. That he was killed by the Defendant;

"3. That the killing was purposely done;

"4. That it was done with * * * malice;

"5. That the crime was committed in the County of Park and the State of Wyoming."

■ "Purposely" was defined by the court for the jury as intention. In another of the court's instructions relating to self-defense, the jury was again instructed that the prosecution must prove "beyond a reasonable doubt, that she intended to kill the deceased." In the same instruction, it was pointed out that she had no burden to prove herself innocent. The jury was as well specifically instructed to consider all the instructions together and to regard each in the light of all the others. All instructions given must be read together. *State v. Jackson*, 1955, 75 Wyo. 13, 291 P.2d 798. Instructions must be considered as a whole and not according to isolated phrases and paragraphs. *Hoskins v. State*, Wyo.1976, 552 P.2d 342. We hold that all the instructions taken together do not relieve the State of proving intent beyond a reasonable doubt as an essential element of second degree murder, as contended by defendant. There was no plain error.

The defendant next asserts that it was error for the court not to give an offered instruction, incorporating the so-called *Eagan*[3] rule as follows:

"You are instructed that where an accused is the sole witness of a transaction charged as a crime, as in this case, her testimony cannot be arbitrarily rejected, and if her credibility has not been impeached, and her testimony is not improbable and is not inconsistent with the facts and circumstances shown, but is reasonably consistent therewith, then her testimony should be accepted. * * *"

A careful reading of the offered instruction and rule reveals that it is only appropriate and proper when its conditions are fulfilled. *Raigosa v. State*, Wyo.1977, 562 P.2d 1009. In this case, the defendant's testimony was not consistent with the facts and circumstances shown. Some of the inconsistencies are those we recounted in connection with the issue raised by the court's instruction on provocation, i. e., her claim of having entered the motel, denied by the manager; her claim of shooting during a scuffle, as opposed to expert evidence that defendant was shot from several feet away; her claim that her eyeglasses were knocked off and separated, as against the testimony of the motel owner that she was wearing them.

To those may be added the inconsistent evidence related to how the body got into the position it was; the results of the polygraph tests, which will later be here covered, as opposed to her testimony; her statement that she at Clyde's said, "I will kick him," as opposed to testimony of several witnesses that she said, "I will kill him;" her testimony as to the violent nature of the deceased, as opposed to the testimony of others that he was good natured and mild mannered; her testimony that he had taken

---

person has assailed another violently with a dangerous weapon likely to kill, which presumption may be rebutted. *State v. Anstine*, 1966, 91 Idaho 169, 418 P.2d 210. By statute in Oregon, there is a conclusive presumption of intent to murder in the second degree, from the deliberate use of a deadly weapon, if death

ensues within one year. *State v. Cunningham*, 1943, 173 Or. 25, 144 P.2d 303. See Key Nos. 145 and 146, Homicide, West's Digest System.

3. *Eagan v. State*, 1942, 58 Wyo. 167, 128 P.2d 215. See also *State v. Lindsay*, 1957, 77 Wyo. 410, 317 P.2d 506, 509.

$120.00 and had $50.00 as a pay advance, as opposed to evidence that he only had about $11.00 on him when shot and there was no accounting as to how he could have spent the rest of the $170.00; her claim that she was going to spend the night with friends because she was afraid for herself when he came home but yet went looking for him and confronted him when he was found; her claim that he was armed but he had no weapon with him (later found where either the deceased or she hid it in the couch); and her testimony that she was choked until she could not breathe, her tongue was hanging out and her eyes bugging until they hurt but yet, less than three hours later, she had no pain and medical testimony was that there were no bruises, scratches or marks whatsoever.

 The defendant was not the sole witness to the crime. There were many witnesses to the bits and pieces forming a complete offense—the foundation of the circumstantial evidence case. The jury was adequately instructed that it was its duty to determine the credibility of witnesses, that they were the exclusive judges of the facts and that a presumption of innocence was with the defendant throughout the trial. The *Eagan* instruction should only be given in those cases where the explanation given by the defendant is not contradicted, either directly or by fair inference from the testimony and evidence. If that is the case, then, the defendant's testimony must be accepted as disclosing the true facts. *Eagan v. State, supra.* But that was not the case.

The defendant assigns as error failure to instruct the jury that "the conduct and general demeanor of the accused after the crime is always relevant. That is to say, you may take into consideration the defendant's actions and demeanor at all times following the shooting incident." The jury was instructed to decide the case "upon a consideration of all the evidence;" admon-

ished to "weigh all the evidence in case. After weighing all the evidence, if you are not convinced of the guilt of the defendant beyond a reasonable doubt, you must find him [her] not guilty," and "before convicting a defendant, the jury [must] be satisfied of the defendant's guilt beyond a reasonable doubt from all the evidence in the case."

 When the principles of a refused instruction, even if correct, have been properly and sufficiently covered by other instructions, its refusal is not error. *Mares v. State,* Wyo.1972, 500 P.2d 530, 539. With the instructions given by the court, the defendant's concern for the victim and her apparent remorse after the crime, particularly in regard to intent and malice, could be fully argued to the jury by the defendant as a part of "all the evidence." The trial judge need not itemize in every little detail each fragment of evidence the jury may consider.

 The defendant claims the trial court erred because it failed to charge the jury, as offered, that "If two conclusions can reasonably be drawn from the evidence, one of innocence, and one of guilt, the jury should adopt the one of innocence." That instruction is included in principle in the court's frequent charge to the jury that the defendant must be proven "guilty beyond a reasonable doubt." This court has held that "reasonable doubt" needs no definition because it has a common meaning. *Cosco v. State,* Wyo.1974, 521 P.2d 1345. The offered instruction is therefore included in other instructions. We disapprove of any use of the offered instruction.

The defendant asserts it to have been error to receive into evidence expert testimony regarding a polygraph or "lie detector" examination of defendant and its results indicating that she was deceptive in answering three relevant questions,[4] in other words lying—not telling the truth.

4. During the course of an examination by use of a polygraph instrument, the operator asks control questions to elicit truthful answers for use in comparing reactions to relevant ques-

tions. The relevant questions and answers were:

 a. "Regarding the shooting of that man, do you intend to answer my questions truthful-

The defendant voluntarily subjected herself to polygraph examination by one stipulation, signed not only by her counsel but by her personally,[5] and another handwritten and signed only by her counsel, by which she agreed that anything pertaining to the examination, the results and opinion could be received into evidence on behalf of either the State or the defendant. The second stipulation went more to the nature of the charges, depending on whether the results were favorable or unfavorable to her. If the outcome indicated she responded truthfully, the State agreed to prosecute only for manslaughter. If the product of the examination was that her responses were untruthful, then, inferentially, the State would proceed with first-degree murder charges, which it did.[6]

In connection with the defendant's arguments that the testimony of the State's polygraph experts, along with results and opinions, should not have been received, she urges the court to hold that if received, there should have been a cautionary instruction that the examiner's testimony does not tend to prove or disprove any element of the crime with which defendant is charged, but at most tends only to indicate that at the time of the examination she was not telling the truth; further, it is for the jury to determine what corroborative weight and effect such testimony should be given. The defendant offered no such instruction. We cannot consider failure to give an instruction, never offered or otherwise covered by appropriate objection, unless within the plain-error doctrine. *Sims v. State, supra; Hurst v. State*, Wyo.1971, 519 P.2d 971; Rule 31, W.R.Cr.P., and Rule

ly?" A. "Yes." (Also asked in a slightly different way. Same result.)
b. "Did you intend to harm that man as you approached the motel?" A. "No."
c. "Did you get a gun from the house with the intention of harming that man?" A. "No."

5. The stipulation is as follows:
"POLYGRAPH AGREEMENT AND STIPULATION
"Having been advised that I am not required to take a polygraph (truth verification) examination I, Diana K. Palmer, do hereby request, voluntarily, without duress, coercion, threats, promises of reward or immunity, to be examined, having had said technique explained to my satisfaction; and hereby release and forever hold harmless the Park Co. Attorney, the Polygraph Examiner and all his superiors, colleagues, and subordinates, and the City of Powell from any and all claims of liability resulting from or arising out of, this examination or the use of the results obtained therefrom. I further authorize the results of this examination as well as information obtained during the interview to be released to those parties having an interest in the same.
"I have been advised of my Constitutional right to remain silent, of the fact that anything I say can and will be used against me in a court of law, and of my right to counsel. I have further been advised that if I am unable to hire an attorney I can request and receive appointment of counsel by the proper authority.
"I hereby agree and stipulate that as a trained polygraph examiner duly authorized to conduct examinations in the State of Wyoming, the examiner is an expert and that anything pertaining to this examination and the entire results thereof, including the opinion of said examiner, be received in evidence in any court of law either on behalf of myself or on behalf of any prosecutor or defense attorney, and I hereby waive my Constitutional privilege against self-incrimination to the extent that the same may be involved in the presentation in evidence of the pertaining matters.
"To the best of my knowledge I have no physical or mental condition which would be detrimental to my taking this examination."

6. The handwritten stipulation is in the language following:
"STIPULATION
"1. Defendant agrees to submit to lie detector test.
"2. If she passes the test, she will not be charged with anything but manslaughter, the state reserving the right to charge with manslaughter.
"2. [sic] If she does not pass, the test results may be used against her in evidence, and her attorneys reserve the right to attack the results by argument and evidence, but they will not object to its admissibility.
"3. If she does pass, the results will be made available to her attorneys, and may be used by them in her defense on any manslaughter charge that may be filed, without objection to admissibility by the state, and the operator will be made available to testify for her concerning the lie detector test and matters pertinent thereto if requested by her attorneys.
"Dated 7–14–75."

51, W.R.C.P.; *Bently v. State, supra.* While the defendant offered an instruction to disregard the polygraph testimony, it bears no resemblance to the one never offered but now claimed to be error in the trial judge's failure to take the initiative. We cannot allow defendant to place the burden of the defense upon a trial judge, nor should we be forced to assume that burden. *Johnson v. State,* Wyo.1977, 562 P.2d 1294; *Gallup v. State,* Wyo.1977, 559 P.2d 1024.

The defendant in her brief does commendably make some objective observations which in this paragraph we shall mention. Science has made great strides toward the goal of determining the truth in judicial proceedings. Sophisticated techniques have been developed in firearms identification through ballistics; identification of a person through fingerprints; identity of assailants through blood analysis; degree of alcoholic intoxication through chemistry and electronics, to mention some. One of the most extraordinary contrivances is the instrument known as the polygraph or lie detector. It measures pulse rate, blood pressure, respiration and electrodermal responses. Physiological changes occur, ostensibly caused by fear and uneasiness induced by the act of lying. Reid and Ibnan, Truth and Deception, pp. 1–5.

Broadly speaking, courts in the past have ruled that an opinion and supporting data of the polygraph examiner are inadmissible in evidence when offered by either party, either as substantive evidence or relating to credibility of a witness. McCormick on Evidence, 2d Ed. § 207, pp. 504–507; 3 Wharton's Criminal Evidence, Torcia 13 Ed. § 630, pp. 249–253.

Apparently, in the federal judicial establishment until rather recently, the results of lie detector tests have been inadmissible.

*United States v. Cochran,* 5 Cir. 1974, 499 F.2d 380, 393, reh. den. 502 F.2d 1168, cert. den. 419 U.S. 1124, 95 S.Ct. 810, 42 L.Ed.2d 825. In *United States v. Oliver,* 8 Cir. 1975, 525 F.2d 731, cert. den. 424 U.S. 973, 96 S.Ct. 1477, 47 L.Ed.2d 743, the defendant urged that he be subjected to a polygraph test and agreed that even if unfavorable, could be offered in evidence by the Government. Ironically, he flunked, so then urged that the agreement and waiver were secured in violation of his rights. The court, after considerable discussion acknowledged that recent developments in the decisions indicate that under certain circumstances a polygraph examination may be admissible. The court placed emphasis on defendant's agreement and explored the qualifications of the expert and allowed the evidence was admissible. Another late federal case, *United States v. Marshall,* 9 Cir. 1975, 526 F.2d 1349, 1360, cert. den. 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 376, discusses the widespread debate concerning the reliability of the polygraph, agrees that it may be admissible but observes that before admissible, the critical requirement of a competent examiner, the judicial problems of self-incrimination and hearsay, places a trial judge in a position where he will rarely abuse his discretion by refusing to admit the evidence even under limited conditions. We would hesitate to give such general standing advice because, as noted by the defendant in the case before us, the polygraph has and is gathering up acceptance.[7]

The one area in which the trend of acceptance is the most noticeable, is the very one on which we are now treading, namely, where the defendant has stipulated as the defendant did here. The cases have been collected in Annotation, 53 A.L.R.3d 1005, entitled "Polygraph—Stipulation of Admissibility." The pocketpart shows an accelerating acceptance where, by stipulation, the

---

7. For an outstanding, comprehensive review of the status of polygraphy, see Tarlow, "Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility In a Perjury-Plagued System," 26 Hastings Law Journal 917. The author cites all leading cases on the subject, analyzes them, and concludes with justification that "The reliability and validity of the polygraph technique and its probative value as evidence of credibility can no longer be doubted." See also "The Emergence of the Polygraph at Trial," 73 Columbia Law Review 1120, and "Hypnosis, Truth Drugs, and the Polygraph: An Analysis of Their Use and Acceptance by the Courts," 21 University of Florida Law Review 541.

defendant has agreed that the results will be admissible.

Some few courts seem to be following *State v. Valdez*, 1962, 91 Ariz. 274, 371 P.2d 894,[8] which lays down qualifications which must be met before the results of a polygraph examination will be admitted as follows: 1. a written stipulation for the test and subsequent admission of the graphs at the trial; 2. the trial judge may refuse to accept such evidence; 3. that if the graphs and examiner's opinion are offered in evidence, the opposing party shall have the right to cross-examine the examiner; and 4. the trial judge should instruct the jury that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged but at most tends only to indicate that at the time of the examination defendant was not telling the truth. Further, the jury members should be instructed that it is for them to determine what corroborative weight and effect such testimony should be given. However, in *State v. Trotter*, 1973, 110 Ariz. 61, 514 P.2d 1249, the same court indicates a willingness to relax any inflexibility which might be indicated. In that case, the trial judge did not give the special instruction to the jury as to what the examiner's testimony tends or does not tend to prove, but the court held that though failure to give the instruction sua sponte was error, reversal was not required, where there was sufficient other evidence by the State to establish the defendant's guilt. That is also true in the case before us here.

*State v. Chavez*, 1969, 80 N.M. 786, 461 P.2d 919, has frequently been cited as holding that regardless of whether there is a stipulation, evidence as to polygraph examinations and results is not admissible over objection, for the reason that the procedure has not gained general acceptance in the field to which it belongs. In a later case, *State v. Lucero*, 1974, 86 N.M. 686, 526 P.2d 1091, the rule was expanded and additional standards set determining that polygraph test results are admissible when each of five requirements are met: 1. tests were stipulated to by both parties to case; 2. when no objection is offered at trial; 3. when court has evidence of qualifications of polygraph operator to establish his expertise; 4. testimony to establish reliability of testing procedure employed as approved by authorities in field; and 5. validity of tests made on subject.

*Lucero* had hardly cooled off when the same court set aside Chavez and requirements 1 and 2 of *Lucero*. *State v. Dorsey*, 1975, 88 N.M. 184, 539 P.2d 204. The New Mexico court declared such requirements mechanistic in character, inconsistent with the concept of due process and repugnant to the purpose of New Mexico Rules of Evidence 101 and 102 in that:

" 'These rules shall be construed to secure fairness in administration * * * and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined'; * * * "

and are particularly incompatible with Rules 401, 402, 702 and 703:[9]

"Rule 401—*Definition of 'relevant evidence.'* 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

"Rule 402—*Relevant evidence generally admissible; irrelevant evidence inadmissible.* All relevant evidence is admissible, except as otherwise provided by constitution, by statute, by these rules, or by other rules adopted by the Supreme

---

8. It is from this case that defendant gets the form of instruction she claims is required from the court, without offer or objection at time of trial. We found such a requirement to be far from universal, the more modern and current concept being that foundation is the only condition to admissibility. While we respect the Arizona court, we suspect that the instruction is a vestigial remnant arising out of the history of polygraphy in its slow acceptance—a compromise nurtured by a lingering doubt.

9. The New Mexico Rules of Evidence cited appear in 4 N.M.S.A.1953, 1975 Supp., and bear the same section numbers and are identical to the Federal Rules of Evidence.

Court. Evidence which is not relevant is not inadmissible.

"Rule 702—*Testimony by experts.* If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

"Rule 703—*Bases of opinion testimony by experts.* The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

■ We are satisfied in our research that the trend of the law has clearly become fixed in favor of admissibility where the parties have stipulated, as the State and defendant have here. There are good reasons for such a view. Basic is the element that the State is entitled to fair treatment as is the defendant. Since the accused would undoubtedly rely on the results, if positive, it would be unreasonable to allow him to defeat their introduction because the results were unfavorable. *State v. Towns,* 1973, 35 Ohio App.2d 237, 64 Ohio Ops.2d 371, 301 N.E.2d 700. The Ohio court attached no strings to the admissibility, other than a requirement that the test be properly given. The court indicated the weight to be given to the testimony of the expert would depend upon his knowledge, training and experience in the field. In the case before us, the trial judge gave a satisfacto-ry instruction with respect to the consideration of expert testimony, to which no objection is made by the defendant.[10] In *State v. Fields,* Mo.1968, 434 S.W.2d 507, as here, the defendant stipulated that polygraph results and the opinion of the expert could be received into evidence. The Missouri court said that it would be "unthinkable" to permit the defendant to reverse his position for the reason that the results were not favorable to him. In *State v. McNamara,* 1960, 252 Iowa 19, 104 N.W.2d 568, the court also held that the defendant, with the assistance of able counsel, agreeing to a polygraph examination, should not be permitted to retract her agreement because the test proved unfavorable.

■ However, we do not base admissibility of polygraph results solely upon the basis of the stipulation. There should be some test of reasonable reliability before final admission by the judge, even though the parties agree. We see no real or unusual problem in that regard and believe that it can be accomplished through existing, accepted rules of evidence.

The Tenth Circuit approached the problem in a practical way. *United States v. Wainwright,* 10 Cir. 1969, 413 F.2d 796, cert. den. 396 U.S. 1009, 90 S.Ct. 566, 24 L.Ed.2d 501. In that case, the defendant offered evidence of a polygraph examination and to submit himself to a government polygraph test. The court declared that in a proper case a polygraph test may be admissible but a foundation must be laid by relevant expert testimony relating to the probative value of such evidence and that before admission, the test is an accepted one in his profession and has a reasonable measure of precision in its indications. The court was

---

**10.** The instruction covering expert witnesses was:

"YOU ARE INSTRUCTED that the rules of evidence ordinarily do not permit the opinion of a witness to be received as evidence. An exception to this rule exists in the case of an expert witness, who by education, study and experience has become an expert on a particular subject and may be permitted to testify as to his opinion on any matter in which he is so versed. The ultimate weight which is to be given to the testimony of expert witnesses is a question to be determined by the jury and there is no rule of law which requires you to surrender your own judgment to that of any person testifying as an expert witness, or to give controlling effect to the opinions of such witnesses; in other words, the testimony of an expert, like that of any other witness, is to be received by you and given such weight as you think it is properly entitled to; but you are not exclusively bound or concluded by the testimony of any witness, expert or otherwise."

opening the door to use of the polygraph in the face of precedent to the contrary.[11]

In *Commonwealth v. A Juvenile (No. 1)*, Mass.1974, 313 N.E.2d 120, the court held that when the defendant agrees in advance to the admission of the results of a polygraph test regardless of their outcome, the trial judge, after a close and searching inquiry into the qualifications of the examiner, the fitness of the defendant for examination, and the methods utilized in conducting the tests, may, in the proper exercise of his discretion, admit the results, not as binding and conclusive evidence, but to be considered with all other evidence as to innocence or guilt. The Massachusetts court added that as a prerequisite, the judge should first make sure that the defendant's constitutional rights are fully protected. The court there concluded through its study, that polygraph testing had come to be regarded as reliable in a growing number of cases, governmental, scientific, legal and private. While the court would not go so far as to grant general admissibility in criminal trials, its conclusion and holding is applicable to the case before us, now.[12]

■ We see no reason why the polygraph expert should be treated in any more restrictive manner than other experts. That the polygraph deals with mind and body reactions should not subject it to exclusion from consideration any more than other testimony of a scientific nature. We have long utilized the expertise of psychiatrists and psychologists to furnish advice and assistance to the jury to explore the mysteries of the mind with respect to mental illness as a defense. Medical doctors are regularly called upon to testify as to the intricate workings of the body in sensitive questions of a complex physical condition or cause of death. It is the normal obligation of the trial judge to protect the jurors from exposure to evidence which might mislead them, regardless of whatever kind of scientific evidence is under scrutiny. The device of cross-examination soon smokes out the inept, the unlearned, the inadequate self-styled expert.

■ The trial court must require foundational qualifications as an expert must demonstrate to the court a substantial reliability and acceptance of the polygraph to establish its probative value, describe the procedure followed in the particular polygraph test sought to be admitted, its results and the opinion. Cross-examination must be allowed. Techniques of impeachment are available; the usual inferences that can be drawn from the demeanor of witnesses are before the jury. These are the normal concomitants of expert testimony.

■ Though in Wyoming, the Federal Rules of Evidence are not in effect, the study that went into them and their background convince us that the ones pertinent here are sound, as expressed in *State v. Dorsey, supra.* The judicial process contemplates fairness, along with a growth of the law of evidence to the end that truth may be ascertained. Relevant evidence, having a tendency to make a fact of consequence more probable or less probable, should be admissible. When scientific evidence will assist the trier of fact, it should be made available. An umbrella of protection is available to exclude relevant evidence if its probative value is outweighed by prejudice, confusion or being misleading. Rule 403, Federal Rules of Evidence.[13]

11. See cases gathered by Tarlow, "Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility In a Perjury-Plagued System," 26 Hastings Law Journal 948, notes 153 and 154, adopting the view that admissibility is allowed when a proper foundation is laid.

12. For outstanding discussion of the polygraph, see *United States v. Ridling*, U.S.D.C.E.D.Mich. S.D.1972, 350 F.Supp. 90; *United States v. Zeiger*, U.S.D.C.D.C.1972, 350 F.Supp. 685, reversed per curiam 155 U.S.App.D.C. 11, 475

F.2d 1280; *United States v. DeBetham*, U.S.D. C.S.D.Calif.1972, 348 F.Supp. 1377, affirmed 9 Cir., 470 F.2d 1367, cert. den. 412 U.S. 907, 93 S.Ct. 2299, 36 L.Ed.2d 972.

13. Rule 403 is as follows:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay,

With that introduction, let us look at the polygraph evidence before the court. The chief of police of Powell, a law enforcement officer with an impressive background of experience and training, underwent extensive schooling in the technique of polygraph at a recognized institute of polygraphy. Through careful direct examination, it was obvious that he had an imposing knowledge of the theory and application of polygraph technology. The instrument used was the most modern. He was in detail examined on the operation of the machine, the measurements taken and their meaning. Every arrangement and existing condition under which the examination was prepared for and conducted was explained. The physical and mental condition of the defendant was inquired into and she was given pre-test preparation, according to accepted methods. She in all particulars was shown to be a fit and proper subject for testing and had, with her counsel, waived in writing any constitutional rights against self-incrimination. The chart records, produced by the equipment, were received in evidence and explained in every minute particular. The defendant's attorney conducted an adroit, skilled, searching cross-examination of the witness, bringing out to an even greater extent the more than acceptable qualifications of the polygraph examiner. The cross-examination entailed some 70 pages of transcript.

The State did not rely entirely upon the testimony of the examiner, because of his limited experience though thoroughly trained. An additional purpose of corroboration was to further establish the acceptability and reliability of polygraph testing and results within its scientific field. A nationally-recognized expert, licensed in several states, with vast experience, having conducted thousands of polygraph tests, testified. He again explained the principles of polygraphy, verified as proper the procedures followed by the examiner, along with the results, conclusively indicating deception by the defendant to relevant questions. He compared the reliability of the polygraph to scientific evidence of ballistics and fingerprints as equivalent, when properly conducted. This balances favorably with the national experience.

There is really no question in this case about the acceptability of polygraph use, because the defendant produced her own experienced polygraph expert, who, likewise, corroborated the reliability of the polygraph when properly used. Though he did not run an independent test of defendant, he challenged and disagreed with the methods followed by the State's witness. That, of course, became merely a question of fact to be resolved by the jury when confronted by a conflict of evidence.

Our conclusion is that every requirement of foundation was fulfilled and we hold that the polygraph results were properly received in evidence.

We must make it clear that in our consideration and discussion of the question, none of our remarks should be construed to hold or to suggest that we hold polygraph evidence admissible in the absence of a stipulation. That must wait for another day when the question is directly before us.[14]

Our extensive discussion of the facts and careful examination of the 1,100-page transcript of testimony and exhibits leaves no doubt but that there was substantial evidence to support the jury verdict in every respect.

Affirmed.

ROSE, Justice, specially concurring.

I read the majority opinion to hold for these following propositions with respect to the polygraph stipulation:

waste of time, or needless presentation of cumulative evidence."

14. We are aware of the argument made that there is no logic to admissibility of polygraph evidence by stipulation when, without stipulation, it is otherwise barred. We do not hold that it is otherwise barred in a proper case. We only say that we will consider the case of admissibility without stipulation when we come to it, viewed in the light of circumstances then and there existing.

(1) Polygraph testing and opinions of an expert—assuming proper foundation is laid—constitute admissible evidence.

(2) The stipulation in this case was binding because it contemplated the jury's exposure to admissible evidence.

(3) There was no error in not giving the jury a cautionary and informative instruction about polygraphy *in this case* since none was offered—but that in the future it should be given.

Assuming this to be the holding, I concur.

It would be impossible for me to concur in the opinion if I were not able to glean from the writing that this court is now recognizing the art of polygraphy to have reached such a state of reliability as will constitute admissible evidence. If this were not so, the stipulation could not make admissible that which was in law inadmissible. This thought is perhaps better expressed by the author of an article in Vol. 26, Part 2, Hastings Law Journal (1975), where he asks:

". . . By what logic should stipulated polygraph evidence be admissible when the same evidence without stipulation is barred?"

The Hastings Law Journal author goes on to say:

". . . While a stipulation may of course admit facts, it is obviously inoperative if it attempts to change the law."